**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Donald WILHOITE, Defendant–Appellant.**

**No. 02–6373.**

United States Court of Appeals,
Sixth Circuit.

Feb. 6, 2004.

Perry H. Piper, Paul W. Laymon, Jr., Asst. U.S. Attorney, U.S. Attorney's Office, Chattanooga, TN, for Plaintiff–Appellee.

William C. Killian, Jasper, TN, for Defendant–Appellant.

Before MARTIN and MOORE, Circuit Judges; and WEBER, District Judge.*

BOYCE F. MARTIN, Jr., Circuit Judge.

Donald Wilhoite appeals the district court's denial of his motion to suppress evidence that police officers discovered during the course of investigating an anonymous tip that Wilhoite was selling cocaine out of his motel room. For the following reasons, we affirm.

## I.

On February 7, 2002, Officer Tim Miller received an anonymous telephone call in which the caller stated that a black male named Don Wilhoite, along with a white female named Patty Butler, were selling crack cocaine from room number one in the Shelbyville, Tennessee, Suburban Motel. The caller also stated that he had observed a significant amount of "traffic" to and from the room for several days. Miller recounted the phone call to his superior, Drug Task Force Director Tim Lane. Miller and Lane discussed other information that they had received about Wilhoite over the previous several months.

---

* The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio, sitting by designation.

For example, Lane had previously heard from other informants that Wilhoite had been selling crack cocaine, which had prompted Lane to obtain a photograph of Wilhoite from the local jail. Although Miller had never seen Wilhoite in person, he had seen his intake photographs and therefore knew that he is a black male. Lane was also familiar with Patty Butler; he knew from previous investigations that she used the alias "Patty Sudberry" and that she had been addicted to crack cocaine for a number of years.

That afternoon, after discussing the situation with Lane, Miller went to the Suburban Motel with Officer Jeff Duncan. Duncan knew that Wilhoite was an "older black gentleman." As they drove by room number one, Duncan saw a black male peering out of the window through the curtains. The two officers watched the room from the parking lot for twenty to thirty minutes, but did not observe anyone enter or leave the room. At Lane's suggestion, Miller decided to employ a "ruse" in an attempt to get the individual to exit the room and thereby create an opportunity to speak with him. Miller placed a phone call to room number one and asked, "Is this Don?" The male on the other end of the phone line replied, "Yeah." Miller, posing as a trustee at the jail, stated that he had overheard deputies talking about a raid on room number one at the Suburban Motel. Duncan exited the police car and walked to the back of the motel to observe the ensuing events from that location. Miller remained in his car in the motel parking lot.

Approximately ten minutes after the phone call, Miller observed a black male exit the motel room, look left and then right, and proceed to walk around the side of the motel. Miller testified, and the district court found, that he had observed Wilhoite apparently holding something beneath his shirt as he exited the room. At this point, neither officer knew that the man who exited the room was Wilhoite. Immediately upon Wilhoite's exit, Miller started his car and began to follow him, but lost sight of him as he walked around the side of the motel. Duncan, from the back of the motel, saw Wilhoite walk around the side of the motel, down the stairs and over to the edge of a nearby wooded area. Miller called Duncan on his cell phone to inform him that Wilhoite had walked around the side of the motel, and Duncan confirmed that he was watching Wilhoite. Duncan observed Wilhoite pause at the edge of the woods and then walk back toward his room.

As Wilhoite walked back to the front of the motel, Miller immediately "pulled the car up, opened the door" and asked Wilhoite "can you come up here and talk to me, step up here." Once Wilhoite "stepped up in the parking lot," Duncan joined them. The two officers were both wearing street clothes and were armed, but they never drew their weapons. Miller identified himself and asked Wilhoite his name, to which he responded, "Don Wilhoite." Miller informed Wilhoite that they were investigating an anonymous tip that he had been selling crack cocaine from room number one. Wilhoite denied this allegation. The officers testified that they did not believe that Wilhoite was under the influence of any drugs or alcohol, nor did they find him "threatening."

When asked whether he had any weapons or drugs on his person, Wilhoite responded that he did not. Nevertheless, Miller testified that he and Duncan "asked him could we pat him down for our safety because we were standing out there with him in the parking lot." The officers proceeded to conduct the pat down, during which several items were removed from Wilhoite's pockets and placed on the squad car. Wilhoite began to remove his pants

to show that he was not carrying any contraband, but the officers stopped him from undressing in the parking lot. During or immediately after the pat down, Miller asked Wilhoite, "would you have a problem if we stepped inside of your room and looked around." [2] Wilhoite consented to a search of his motel room, saying that he had nothing to hide. The three men walked to the motel room and Wilhoite opened the door to let the officers inside.

Once inside the room, Duncan smelled the slight odor of what he thought was marijuana, and both officers observed in plain view various items of drug paraphernalia throughout the room. The officers again requested Wilhoite's consent to search the room, which Wilhoite provided. The officers directed Wilhoite to sit in a chair beside the door and proceeded to search various parts of the room, discovering marijuana and cocaine.

The officers then contacted Lane, as well as Officer Tracy Nelson of the Shelbyville Police Department's K-9 unit. Nelson reported to the motel with her drug detection dog. The dog searched the room and then the edge of the woods where Duncan had observed Wilhoite. The dog alerted to a black plastic bag at the edge of the woods, which contained marijuana, crack cocaine and a pistol. Lane arrived at the motel and was briefed on the situation. He read Wilhoite his rights and asked if he would be willing to talk to him. Wilhoite agreed and gave a statement admitting that the cocaine that the officers had seized from his motel room belonged to him, that he had been selling crack from that room and that he had placed the black plastic bag at the edge of the woods. He also admitted to placing some cash in a trash can, which officers later discovered and seized.

On March 13, 2002, Wilhoite was indicted on one count of possession with intent to distribute cocaine base ("crack") in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). On April 24, Wilhoite filed a motion to suppress the evidence that the police had seized in his motel room and at the edge of the woods, as well as the inculpatory statements that he had made to the officers following the seizure of that evidence. The district court held a hearing on the motion on May 1, which featured testimony from Miller, Duncan and Lane. When asked why Wilhoite was initially approached in the parking lot, Duncan summarized the reasons as follows:

... we had received a call that Mr. Wilhoite was in Room Number One and had been dealing crack cocaine out of that room ... Agent Miller saw an older black gentleman who we knew Mr. Wilhoite to be an older black gentleman exit that room, and once he walked to the woodline and walked back, we thought, well, that probably is in all probability going to be who we're looking for.

At the end of the hearing, the district court found that the officers' encounter with Wilhoite was an investigative detention—otherwise known as a "Terry stop," see Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)—that was supported by reasonable suspicion, and that during this permissible detention Wilhoite voluntarily consented to the search of his room. Accordingly, the district court denied the suppression motion. On May 13, Wilhoite pleaded guilty, but reserved the right to appeal the denial of his suppression motion. On October 4, Wilhoite was sentenced to prison for a term of seventeen years and six months. A timely notice of appeal was filed on October 11.

---

**2.** The record is unclear as to precisely when Miller requested Wilhoite's consent to search

his motel room.

## II.

An appeal from the denial of a suppression motion is subject to a twofold standard of review. The district court's underlying factual determinations are reviewed for clear error, *United States v. Leake*, 95 F.3d 409, 416 (6th Cir.1996), while the legal conclusions drawn from those facts are reviewed de novo, *United States v. Williams*, 962 F.2d 1218 (6th Cir.), *cert. denied*, 506 U.S. 892, 113 S.Ct. 264, 121 L.Ed.2d 194 (1992). "[A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal." *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

### A.

The crux of Wilhoite's argument is that his encounter with Officers Miller and Duncan in the parking lot of the Suburban Motel—during which he consented to a search of his motel room—was a *Terry* stop for which the officers lacked reasonable suspicion and, therefore, was an unconstitutional seizure under the Fourth Amendment. Wilhoite contends that his consent to the search of his motel room was invalid because it was given during this unconstitutional seizure. Accordingly, he seeks suppression of the evidence found during the search and the statements that he made to the police following the discovery of that evidence. The United States argues, by contrast, that Wilhoite's consent was valid because it was provided during a permissible encounter with the police. According to the United States, the encounter was either a *Terry* stop that was supported by reasonable suspicion—as the district court found—or was merely a consensual encounter for which no objective suspicion is generally required.

We have explained that there are three types of permissible encounters between police and members of the public: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Avery*, 137 F.3d 343, 352 (6th Cir.1997) (citations omitted). Only the second two types of encounters constitute "seizures" within the meaning of the Fourth Amendment.

In a consensual encounter, "law enforcement officers may approach an individual and ask general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave." *United States v. Waldon*, 206 F.3d 597, 603 (6th Cir.), *cert. denied*, 531 U.S. 881, 121 S.Ct. 193, 148 L.Ed.2d 134 (2000) (citing *United States v. Peters*, 194 F.3d 692, 698 (6th Cir.1999)); *see also Florida v. Bostick*, 501 U.S. 429, 434–35, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ("even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage—as long as the police do not convey a message that compliance with their requests is required").

An encounter rises to the level of a Fourth Amendment "seizure," by contrast, when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of

the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

The United States relies heavily upon *Waldon* in support of its contention that the entire encounter was purely consensual. *Waldon,* however, is distinguishable from the present case. In *Waldon,* a police officer approached an individual who matched the description of a bank robbery suspect. The officer asked to see the individual's identification, but did not touch the identification or the individual throughout the relevant portion of the encounter. We explained that "law enforcement officers may approach individuals and ask them questions without having any reasonable suspicion of criminal activity" and noted that during this part of the encounter the officer "did not act in any way that suggested Waldon was not free to leave." 206 F.3d at 604. We also noted the significance of the fact that the officer refused to take the individual's wallet or license, "thereby avoiding any limit on Waldon's freedom to leave." *Id.*

■ In this case, even if the encounter between Wilhoite and the officers began in a consensual manner, at the time that Wilhoite consented to the search of his motel room the encounter had escalated to a *Terry* stop. The record reveals that Wilhoite's consent came only after—or at least contemporaneously with—being subjected to a pat down, during which several items in his pockets were removed and placed on the squad car. Unlike the situation in *Waldon,* an objective person in Wilhoite's situation would not have felt free to leave. *See Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870.[3]

B.

Given that Wilhoite was "seized" within the meaning of the Fourth Amendment, the next question is whether the officers possessed the requisite level of suspicion to justify the seizure. It is well established that the level of suspicion required to justify a *Terry* stop is "reasonable suspicion." *See United States v. Heath,* 259 F.3d 522, 528 (6th Cir.2001) ("when a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances") (citations and quotation marks omitted). "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity ... the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

Wilhoite argues that the anonymous tip in this case, combined with the officers' subsequent observations, do not amount to reasonable suspicion. For that proposition he relies upon *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). That case, however, is easily distinguishable from the present one. In *J.L.,* the Court held that an anonymous tip that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun," *id.* at 268, 120 S.Ct. 1375, was insufficient, without more, to create reasonable suspicion justifying an

---

3. As support for its assertion that the entire encounter was consensual, the United States argues that Wilhoite consented to the patdown. That assertion is not supported by the record. Miller did testify that he "asked [Wilhoite] could we pat him down for our safety," but the record is completely silent as to how Wilhoite responded to that alleged question.

investigative detention and protective frisk of the person who was the subject of the tip, *id.* at 271–72, 120 S.Ct. 1375. The tip in *J.L.* was not sufficiently "reliable" because it "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." *Id.* at 271, 120 S.Ct. 1375. The Court held that the officers lacked reasonable suspicion to investigatively detain the defendant given the unreliability of the tip and the fact that the officers had observed no other suspicious activity.

█ Unlike the situation in *J.L.*, the officers in this case had not only the information provided in the anonymous tip, but also their observations of Wilhoite's suspicious conduct at the motel. In total, the officers had gathered the following information by the time they seized Wilhoite: (1) the anonymous tip stated that Don Wilhoite was selling crack cocaine out of room number one of the Suburban Motel; (2) the officers knew that Don Wilhoite was an older black male; (3) when they arrived at the Suburban Motel, Duncan observed an older black man inside room

number one peering out of the curtains; (4) during Miller's fictitious phone call, the individual who answered the phone confirmed that his name was Don; and (5) after receiving the phone call, Wilhoite exited the room, walked to the edge of the nearby wooded area, paused briefly, and then returned back toward the motel.

When properly viewed in context, Wilhoite's behavior following Miller's fictitious phone call was especially suspicious.[4] Just minutes after Miller, posing as a jail trustee, warned Wilhoite that a police raid was being planned on his motel room, Wilhoite left his room carrying something under his shirt, walked toward some nearby woods, paused briefly at the edge of the woods, and then returned to the motel. Considering, as we must, the totality of the circumstances, we conclude that the officers possessed a "reasonable and articulable suspicion" that Wilhoite was "involved in criminal activity." *Heath,* 259 F.3d at 528. As the district court found, this was a classic and proper *Terry* stop. Therefore, Wilhoite cannot prove that his consent was the product of an unconstitutional seizure.[5]

---

4. Wilhoite challenges the officers' use of the fictitious phone call to induce him to exit his motel room. In support of that contention, he relies primarily upon two cases: *United States v. Huguenin,* 154 F.3d 547 (6th Cir. 1998) and *State v. Avanti,* C.C.A. No. 88–83–III, 1989 WL 4978 (Tenn.Crim.App. Jan.25, 1989), an unpublished Tennessee Court of Criminal Appeals opinion. Neither case, however, stands for the proposition for which it is cited. Each case did, in fact, involve the granting of a motion to suppress. The reason for the courts' decisions, however, had nothing to do with the police employing a "ruse" or a "trick" in order to catch the defendants engaging in illegal activity. Counsel for Wilhoite conceded at oral argument that it is not necessarily unconstitutional for police officers to use trickery in their law enforcement efforts. In fact, as the Supreme Court has explained, it is "appropriate" and "frequently essential to the enforcement of the law" for police officers "to reveal the criminal design; to expose the illicit traffic, the prohibited pub-

lication, the fraudulent use of the mails, the illegal conspiracy, or other offense, and thus to disclose the would-be violators of the law." *Sorrells v. United States,* 287 U.S. 435, 441–42, 53 S.Ct. 210, 77 L.Ed. 413 (1932) (citations omitted). In short, we find no constitutional problem with the officers' use of the fictitious phone call in an effort to persuade Wilhoite to leave his motel room.

5. Even if Wilhoite's consent was given during an unconstitutional seizure, that would not necessarily make the consent invalid. *See United States v. Guimond,* 116 F.3d 166, 170–71 (6th Cir.1997) (reversing the district court's conclusion that a defendant's consent to search was invalid simply because it was given during an unconstitutional seizure). Rather, it would be necessary to determine whether the consent was valid notwithstanding the Fourth Amendment violation. *See Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (articulating factors relevant to determining the validity of a de-

## C.

Nor has Wilhoite offered any other reason why his consent to the search of his motel room should be deemed invalid. Citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the district court found that Wilhoite's consent to the search was "voluntary in all respects." We may not disturb the district court's finding in that regard unless it is clearly erroneous. *United States v. Taylor,* 956 F.2d 572, 577 (6th Cir.1992). The validity of a consent to search is a question of fact, to be proved by the government and determined by the "totality of all the circumstances." *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041; *see also United States v. Crowder,* 62 F.3d 782, 786–87 (6th Cir.1995). Relevant circumstances include "the youth of the accused, his lack of education, or his low intelligence; the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep," *id.* at 226, 93 S.Ct. 2041 (internal citations omitted), as well as the defendant's "knowledge of the right to refuse consent," *id.* at 227, 93 S.Ct. 2041. As applied in this case, these considerations compel the conclusion that the district court did not commit clear error in determining that Wilhoite validly consented to the search of his motel room.[6]

fendant's confession following an illegal arrest); *United States v. Santiago,* 310 F.3d 336, 342 (5th Cir.2002) (employing similar factors to determine the validity of a defendant's consent to search following a Fourth Amendment violation).

## III.

For the foregoing reasons, the district court's denial of Wilhoite's motion to suppress is AFFIRMED.

6. This analysis focuses upon the consent that Wilhoite provided prior to the officers' entry into his motel room. We also note that after Wilhoite let the officers into his motel room, he again affirmatively consented to a search of the room.