UNITED STATES of America Plaintiff

v.

**Kenneth BLACKSHAW Defendant**

**No. 1:04 CR 464.**

United States District Court,
N.D. Ohio,
Eastern Division.

March 4, 2005.

Lori A. Hendrickson, Office of the U.S. Attorney, Cleveland, OH, for Plaintiff.

Terry H. Gilbert, Friedman & Gilbert, Cleveland, OH, for Defendant.

## MEMORANDUM OF OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS NUNC PRO TUNC TO 23 FEBRUARY 2005 (CLERICAL ERROR)

WELLS, District Judge.

Before the Court is defendant Kenneth Blackshaw's ("Blackshaw") motion to suppress evidence seized from his person and the vehicle he was in at the time Officer Kyle Cunningham ("Cunningham") of the East Cleveland Police Department performed an investigative stop in response to an anonymous 911 call. (Docket # 14). Mr. Blackshaw seeks to suppress the approximately $31,067 in U.S. currency and the 162.9 grams of cocaine found during the search, averring that Officer Cunningham lacked the reasonable suspicion necessary as predicate to a stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Florida v. J.L.* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). (Motion to Suppress at 3, 4) In its response to Mr. Blackshaw's motion, the government maintains Officer Cunningham possessed reasonable suspicion as a result of the defendant's proximity to the reported incident, the physical similarity of the defendant to the reported description, the similarity of the defendant's vehicle to the reported vehicle, and the officer's rapid response to the 911 call. (Docket # 15, Response by the Government at 6). The government maintains that probable cause for the search of the defendant's vehicle existed pursuant to *United States v. Lumpkin*, 159 F.3d 983 (6th Cir.1998). (Docket # 15, Response by the Government at 5). An initial evidentiary hearing was held on 7 February 2005, with counsel and defendant present. (Docket # 21). Officer Cunningham provided the sole testimony. (Hearing Tr. I at 3). The court continued the suppression hearing on 11 February 2005, where the sole evidence placed before the court consisted of an audio-video of the investigatory stop gathered from Officer Cunningham's police car camera.[1] (Government's Exhibit 3).

Based on the evidence adduced at the hearings and the relevant law, this Court grants defendant's motion to suppress.

## I. FACTUAL BACKGROUND

The court has gleaned the following facts from the evidence submitted. At approximately 8:42 pm, on 26 July 2004, an anonymous caller notified the 911 dispatcher of a dispute in the middle of the street near 1818 Hastings. (Defendant's Exhibit A, audio tape of 911 and police radio calls). The caller requested the police respond to the confrontation between two males, one of whom was brandishing a handgun. The caller remained on the 911 line for approximately 90 seconds, relating to the dispatcher that the male with the handgun was driving off toward Euclid Avenue in a white Cadillac before the caller lost sight of the vehicle.[2] The caller described the

---

1. The existence of the possibility of the audio-video evidence did not become apparent until Officer Cunningham testified on 7 February 2005 that his police car was equipped with a dashboard camera that was operating, in color and with audio, at the time of the investigatory stop of Mr. Blackshaw. (Hearing Tr. I at 36).

2. While the 911 caller related to the dispatcher that the Cadillac in question was leaving Hastings and driving toward Euclid Avenue, the dispatcher did not relay that information

driver as wearing a white tee-shirt and blue jeans.

Officer Cunningham responded to the dispatcher's bulletin, approaching the reported location by proceeding east on Euclid Avenue. Approximately two minutes after the 911 call, Officer Cunningham observed Mr. Blackshaw's Cadillac, facing east, in front of an apartment building at 15632 Euclid Avenue.[3] Mr. Blackshaw's vehicle was light tan with a dark blue Landau roof. According to the police audio-video of the incident, the painted portion of the Cadillac appeared as nearly white and it appeared as white to Officer Cunningham. (Plaintiff's Exhibit A; police squad car audio-video; Tr. I at 31). As he pulled up behind Mr. Blackshaw's Cadillac, Officer Cunningham observed the defendant seated in the driver's side of the stationary vehicle with the engine running while a passenger was seated on the passenger side with the passenger door partially opened to the sidewalk.[4]

Officer Cunningham testified that he pulled up behind Mr. Blackshaw's Cadillac, processed the defendant's plates and called for backup before exiting his vehicle. (Tr. I at 8). Early in the suppression hearing, Officer Cunningham related that, while still in his patrol car and without incident, he activated his overhead police lights as he pulled up behind the Cadillac. (Tr. I at 9). Later in the hearing, Officer Cunningham pointedly remembered that he had activated his overhead lights because he suspected Mr. Blackshaw and his passenger were consummating a drug deal. (Tr. I at 62–65). In that later testimony, Officer Cunningham further related that when he switched on his lights Mr. Blackshaw's female passenger "immediately tried to jump from the car and walk away," in an attempt to leave the scene. (Tr. I at 62).

to the field. The officers knew only that the Cadillac was on Hastings Avenue. At the suppression hearing, Officer Cunningham related that he learned from an Officer Harris only that the Cadillac was leaving the area, not that it was proceeding to Euclid Avenue. (Tr. I at 28).

**3.** The location and orientation of Mr. Blackshaw's Cadillac is of some importance, given the government's stress on Officer Cunningham's rapid response to the dispatcher's call. Officer Cunningham arrived at Mr. Blackshaw's Cadillac within two minutes of the call. Yet, the defendant's vehicle was parked on the east-bound side of Euclid Avenue pointing toward the intersection of Hastings Avenue with Euclid, a position and orientation that would require Mr. Blackshaw, had he driven from Hastings, to exit Hastings moving west-bound only to negotiate a u-turn across two lanes of on-coming traffic. This maneuver would have had to occur across the path of Officer Cunningham's patrol car as it approached Hastings from less than two minutes away. As Officer Cunningham testified on 8 August 2004:

Q: And when you arrived on the scene, did you observe a male waiving a gun?

A: I never made it to Hastings.

Q: Okay. What happened before you arrived at Hastings?

A. As I was approaching Hastings from Euclid and Taylor [two blocks west], I had a full view of Hastings, and our dispatch came back on the radio and stated that a white Cadillac had just left Hastings and headed in an unknown direction.

(East Cleveland Municipal Court audio transcript at 4). Given the testimony, it seems likely, given Officer Cunningham's path toward Hastings, he would have witnessed Mr. Blackshaw's Cadillac moving from Hastings and committing a u-turn across Euclid Avenue, rather than finding the vehicle parked along Euclid Avenue.

**4.** Officer Battle, who did not testify at the suppression hearing, noted in testimony during the 8 August 2004 East Cleveland Municipal Court hearing that as he approached the passenger side of the Cadillac the door was not open but the window was rolled down. The audio-video of the incident indicated that Mr. Blackshaw's passenger door was slightly open. (Government's Exhibit 3).

In response to the passenger's move to flee, Officer Cunningham testified that, while he remained in his patrol car, he called over his loudspeaker for the passenger to return to the Cadillac and she complied. *Id.*

Importantly, Officer Cunningham related none of that information in his police incident report at the time, nor did he relate his rather belated observations during the 8 August 2004 hearing in the East Cleveland Municipal Court. (Tr. I at 65–67). In both his early statements at the suppression hearing and his testimony during the August hearing, Officer Cunningham confirmed he observed no suspicious activity until after he had ordered Mr. Blackshaw from the car and proceeded with a pat down search incident to a *Terry* stop.[5] (Tr. I at 17, 43).

A review of the police car audio-video, which recorded the entire scene of the incident from the moment Officer Cunningham pulled up behind Mr. Blackshaw's Cadillac, reveals a different series of events than were testified to by Officer Cunningham at the suppression hearing. The government has relied upon Officer Cunningham's belated testimony regarding Ms. Burke's posture and her attempt to flee the vehicle in its effort to establish the central element of whether the officer independently observed Mr. Blackshaw engaging in suspicious activity. Yet, the audio-video clearly indicates that Ms. Burke made no attempt to flee the scene. The audio-video also reveals that the officer did not speak to Mr. Blackshaw's passenger over the police car loudspeaker ordering her to return to the vehicle.[6] The audio-video does, however, record Officer Cunningham warning a passing pedestrian to move away from the Cadillac. (Government's Exhibit 3).

In the recorded radio conversation, Officer Cunningham confirmed with the dispatcher they were looking for a lone man with a white tee-shirt and blue jeans. (Defendant's Exhibit A). The dispatcher reconfirmed that "its [sic] supposed to be one male in a car with a white tee-shirt blue jeans." (Radio dispatch tape, Exhibit A). Officer Cunningham approached the driver's side of the vehicle where Mr. Blackshaw was seated, and responded to the dispatcher, "[t]he man I got here has a white tee-shirt." (Radio dispatch tape, Exhibit A; audio-video Govt's Exhibit 3).[7]

---

5. Officer Cunningham testified that after he informed Mr. Blackshaw that he would have to pat him down and ordered the defendant to step out of the vehicle, the officer observed a plastic bag partially obscured under the driver's front seat which contained money and "$100 dollar bills." (Tr. I at 17).

6. During that portion of his testimony, Officer Cunningham also related that Mr. Blackshaw's passenger, Monika Burke, was leaning over toward Mr. Blackshaw with her legs sticking out the open car door. (Tr. at 63–64). The audio-video, which encompassed the entire scene and was running from the moment Officer Cunningham pulled up behind Mr. Blackshaw's vehicle, confirmed some shadowy head movements in the Cadillac but did not show Ms. Burke's body motions as testified to by Officer Cunningham at the hearing. (Government's Exhibit 3).

7. The police audio-video confirms that Mr. Blackshaw was wearing a white sport jersey, blue jeans and red baseball style cap. However, Officer Cunningham's testimony description of Mr. Blackshaw's clothing has been markedly inconsistent. As noted, at the time of the stop the officer pointedly observed that Mr. Blackshaw fit the reported description, relaying to the dispatcher, "The man I got here has a white teeshirt." Yet, in the 8 August 2004 hearing in East Cleveland Municipal Court, convened to determine whether to bring federal charges against Mr. Blackshaw, Officer Cunningham testified:

Q. And any description of this male?
A. As I approached the car, I called the radio and asked for a description. And the description was a blue shirt, also blue jeans, which Mr. Blackshaw had on at that particular time. This male here matched the description given.
Q. That was a blue shirt?

Further, Officer Cunningham sought to confirm whether the anonymous caller had mentioned a blue top in describing the Cadillac, noting that Mr. Blackshaw's Cadillac had a dark blue roof. The dispatcher relayed they were provided no further information than the description of a white Cadillac, as the 911 caller had already disconnected without providing a phone number. (Tr. I at 8).

With Officer Tony Battle on the passenger side of the vehicle, Officer Cunningham informed Mr. Blackshaw the police had received a call about a man with a gun. When asked how long he had been parked on Euclid, Mr. Blackshaw responded that he had been at the location for twenty minutes. Officer Cunningham ordered Mr. Blackshaw to place his hands on the steering wheel and asked him if he had a firearm, which the defendant denied. Officer Cunningham advised Mr. Blackshaw that he needed to perform a pat-down search to verify he did not have a weapon. Officer Cunningham then ordered Mr. Blackshaw to step from the vehicle and place his hands on the roof of the car so that the officer might pat the defendant down. (Tr. I at 8–11).

In patting-down Mr. Blackshaw, Officer Cunningham testified that he felt a hard object in defendant's right front pocket. The officer reached into the pocket and felt a rolled bundle of paper which he assumed was cash. The officer felt another hard object in defendant's left front pocket and repeated the procedure, in both

instances leaving the cash rolls on defendant's person.[8] (Tr. I at 10). According to the audio-video evidence, Officer Cunningham then moved Mr. Blackshaw to the back of the Cadillac and returned to the car where he searched only momentarily before telling his fellow officers to handcuff Mr. Blackshaw and his passenger. (Government's Exhibit 3).

Officer Cunningham testified that while he patted down Mr. Blackshaw, Officer Battle engaged the female passenger, Monika Burke, on the other side of the car. Ordering her out of the vehicle, the officer requested she open her purse to verify that she was not carrying a firearm. In Ms. Burke's purse, Officer Battle viewed and seized one plastic bag containing suspected crack cocaine. According to Officer Cunningham's testimony, Ms. Burke then told Officer Battle that Mr. Blackshaw had sold her the crack cocaine. Officer Battle related that information to Officer Cunningham who then placed Mr. Blackshaw under arrest for violation of an East Cleveland Ordinance, Mirandized him and placed him in the back of his patrol car. (Tr. I at 47–48). The police audio-video, however, indicates a very different sequence of events. Mr. Blackshaw and Ms. Burke were handcuffed Immediately after Officer Cunningham began to search the defendant's car and clearly prior to Officer Battle's independent search of Ms. Burke's handbag. (Government's Exhibit 3).

Ms. Burke was also placed under arrest and Mr. Blackshaw's Cadillac was again

---

A. And blue jeans.
Q. Blue jeans. Do you recall whether Mr. Blackshaw had a jersey on?
A. He had a blue jersey on with white numbers.
Q. So a blue jersey with white numbers?
A. Yes.
Q. Do you know the team?
A. No, I don't know the team.
(Exhibit B, p. 14. Def's Suppression Motion; Tr. I at 53–54). Finally, during the suppres-

sion hearing, Officer Cunningham testified that Mr. Blackshaw was indeed wearing a white teeshirt that evening.

8. The audio-video track indicates that Officer Cunningham removed Mr. Blackshaw's money roll enough to cause him to later remark in conversation with a fellow officer that he observed a roll of $100.00 bills. (Government's Exhibit 3).

searched and eventually towed. Officers found approximately $24,025.00 in cash in a plastic bag under the driver's seat and several bags of suspected crack cocaine in the center armrest. Officers then placed Mr. Blackshaw under arrest for violating state drug law. Officer Cunningham testified the currency, approximately $7,037.00, was removed from Mr. Blackshaw's pockets during his booking at the police station.

The Officers found no weapon on Mr. Blackshaw or in his vehicle.

## II. LAW AND ANALYSIS

The Fourth Amendment states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated,...." U.S. Const. amend. IV. This protection extends to the unreasonable seizure of persons, *California v. Hodari D.*, 499 U.S. 621, 624, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), and "belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs," *Terry v. Ohio*, 392 U.S. 1, 8–9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Of course, the Fourth Amendment does not prohibit all seizures, only those that are unreasonable. *Id.* at 9, 88 S.Ct. 1868.

Pursuant to *Terry*, the police may carry out an investigative stop based upon reasonable suspicion the individual is engaged in criminal activity. Attendant with that stop, the police may pat down an individual for weapons. *Terry* 392 U.S. at 22–24, 88 S.Ct. 1868. The Supreme Court held in *Terry*:

> Where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.*, at 30, 88 S.Ct. 1868. The Supreme Court expounded on *Terry* in *United States v. Cortez*, 449 U.S. 411, 417–418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), stating,

> [a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity ... the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

*Terry* is the starting point for "stop and frisk" considerations, yet the Supreme Court has established separate standards for evaluating the propriety of investigative stops that issue not from an officer's observations, as did *Terry*, but from an unverifiable and anonymous source, as did this case. Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, *see Adams v. Williams*, 407 U.S. 143, 146–147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," *Alabama v. White*, 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). However, there are situations in which an anonymous tip, suitably corroborated, exhibits "sufficient indicia of reliabil-

ity to provide reasonable suspicion to make the investigatory stop." *Id.*, at 327, 110 S.Ct. 2412.

In *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), the Court confronted the question of whether an anonymous tip, like the 911 call in this case, provided the necessary "indicia of reliability" to form the basis for an investigative stop. In that case they held that it did not. In *J.L.*, the officers received an anonymous call indicating a black male at a bus stop, dressed in a plaid shirt, had a gun. When officers arrived at the bus stop six minutes later, they observed three black males, one of whom was wearing a plaid shirt. The officers observed the one black male as matching the anonymous identification, yet they did not observe the man doing anything illegal or suspicious nor did they observe any firearm. However, based on the tip, the officers stopped and frisked the man and found the weapon. In holding the search illegal and unjustified under the reasonable suspicion doctrine, a unanimous Supreme Court observed:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster

means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. *The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.* Cf. 4 W. LaFave, Search and Seizure § 9.4(h), p. 213 (3d ed.1996) (distinguishing reliability as to identification, which is often important in other criminal law contexts, from reliability as to the likelihood of criminal activity, which is central in anonymous-tip cases).

*J.L.*, 529 U.S. at 272, 120 S.Ct. 1375 (emphasis added).[9] *See also Chandler v. Miller*, 520 U.S. 305, 313, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997) (finding that a warrantless search must be based on individualized suspicion).

The facts of this case differ only slightly from those in *J.L.*, as here the anonymous 911 call came to the police through the dispatcher. However, in *Feathers v. Aey*, 319 F.3d 843 (6th Cir.2003),[10] the court concluded for the purposes of establishing reasonable suspicion the distinction made no difference. Feathers argued the case was an anonymous tip case, because insofar as the officers' initial detention was based only on an unsubstantiated anonymous tip, the officers' knowledge was in-

**9.** The *J.L.* Court also declined to adopt the government's second major argument that the standard *Terry* analysis should be modified to license a "firearm exception." Under such an exception, a tip alleging an illegal gun would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing.

**10.** *Feathers* involved an anonymous individual who called 911 at 1:30 AM, with the report that a bearded white male on a porch on North Howard Street had pointed something at the caller and told him to shut up. That call, filtered through the dispatcher, led the police to Feathers who, when the officers arrived, was observed hugging his wife on the

front porch of their home. The officers shouted at Feathers to move to the end of his porch and take his hands out of his pockets. Feathers complied but did not remove his hands from his pockets at the first instruction. After receiving this order a third time, Feathers turned away and, removing his hands from his pockets, went back toward the door that led into his house. Opening the door with his right hand, Feathers leaned into his house and told his father, who was inside, to come outside quickly and to bring the video camera. The officers ran up the porch stairs and seized him from behind while he was leaning into the house. Feathers was arrested after an ensuing struggle.

sufficient under *Florida v. J.L.*, to justify a *Terry* stop. The officers argued the case was a dispatcher case, because insofar as the officers' knowledge was based only on the initial dispatch, they could not have known that the tip at issue was anonymous.

The court agreed with Feathers, that for purposes of determining whether the *Terry* stop violated Feathers's Fourth Amendment rights, they must consider it an anonymous tip case, and conclude that the search was unconstitutional under *J.L.*, In so holding, the *Feathers* court observed that the Supreme Court had expressly held when an anonymous tip is neither supported with "indicia of reliability" nor corroborated with police observation, it cannot provide an officer reasonable suspicion for a *Terry* stop. *See also U.S. v. Patterson*, 340 F.3d 368, 371 (6th Cir.2003) (observing that "[t]he anonymous tip in this case offered no reliable or meaningful information in support of reasonable suspicion because it was not specific enough as to a prediction of future unlawful activities"); *U.S. v. Roberson*, 90 F.3d 75, 81 (3rd Cir.1996) (concluding that an anonymous tip "had no basis for reliability" even though it contained a detailed description of a suspect including height, weight and clothing).

In the few instances when the Sixth Circuit has distinguished the holding in *J.L.*, to find reasonable suspicion predicated on an anonymous tip, such suspicion has always been built upon more than the tip itself. *See U.S. v. Wilhoite*, 86 Fed. Appx. 945 (6th Cir.2004) (distinguishing *J.L.*, and upholding a *Terry* stop because the police had an anonymous tip and had personally observed Wilhoite's "especially suspicious" behavior); *U.S. v. Fisher*, 27 Fed.Appx. 558 (6th Cir.2001) (distinguishing *J.L.*, where the detectives' interest in the defendant was sparked not by an anonymous tip, but by information from a "confidential source").

Mr. Blackshaw relies upon both *J.L.*, and *Patterson* to urge suppression, because the anonymous 911 call alone did not provide sufficient "indicia of reliability" to justify a stop and frisk of the defendant. At most, the anonymous call provided a clothing description, a vehicle description, an approximate location, and report of a handgun. Pursuant to *J.L.*, this is not enough, because an anonymous tip must do two things: identify a determinate person and reliably assert illegality.

The 911 call alone did not provide reasonable suspicion with regard to Blackshaw. Officer Cunningham lacked even the corroborated facts evident in *J.L.*, where an anonymous tip provided the police a concise physical description and specific location which together matched a suspect. Blackshaw's white long-sleeve jersey was similar only in color to the reported white tee-shirt, while even Officer Cunningham questioned the dispatcher with regard to the defendant's Cadillac, which was tan with a blue top. Moreover, Mr. Blackshaw's location and orientation—parked on Euclid facing Hastings Avenue—did not comport with Officer Cunningham's understanding that the suspect had driven away from Hastings Avenue within the few brief moments it took for the officer to arrive.

In addition, Officer Cunningham testified to the absence of any suspicious activity until after he ordered Mr. Blackshaw from his vehicle for a pat-down search, at which point the *Terry* stop had already occurred.[11] (Tr. 17–43; State Proceedings

---

11. Officer Cunningham testified to observing a plastic bag containing money partially obscured under the driver's seat as Mr. Blackshaw exited the car. Mr. Blackshaw was ordered out of the car so that the officer could perform a pat-down search incident to a *Terry* stop. As already noted, Officer Cunningham's belated testimony that he suspected a drug transaction in progress, turned on his

Tr. 6–7). Consequently, Officer Cunningham lacked the reasonable basis to independently substantiate the anonymous caller's assertion of illegality.

Mr. Blackshaw further maintains the officers lacked reasonable suspicion to reach into defendant's pockets when conducting a *Terry* stop. The defendant points to *Terry* in substantiating his assertion that Officer Cunningham commenced a pat-down search without cause, noting that a protective frisk is permitted "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officers or to others." *Terry* at 24, 88 S.Ct. 1868 Mr. Blackshaw relies upon the Supreme Court's decision in *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) to establish that even if, *arguendo*, Officer Cunningham had a reasonable suspicion to search defendant's pockets based on the report of a man with a gun, such suspicion did not allow material that is not obviously contraband to be seized. Pursuant to *Dickerson*, if an object's incriminating nature was not readily apparent by touch, the seizure lacked legal foundation.

*Dickerson* does provide a "plain-feel" exception which permits the seizure of non-threatening contraband if an officer lawfully pats-down a suspect's outer clothing and feels an object whose "contour or mass makes its identity immediately apparent." *Dickerson*, 508 U.S. at 375, 113 S.Ct. 2130. In carving out this exception, the *Dickerson* Court determined there had been no invasion of privacy beyond that already authorized by the officers' search for weapons. However, because Officer Cunningham obtained the contents of Mr. Blackshaw's pockets only after conducting an unauthorized search, *Dickerson's* "plain-feel" exception does not apply.

The government relies upon *Terry* to argue the officers possessed reasonable suspicion to carry out an investigatory stop and weapons frisk of Mr. Blackshaw. According to the government, the *"crucial factors* in analyzing the lawfulness of the investigative stop," are Mr. Blackshaw's proximity to Hastings Avenue and the fact that he was in a Cadillac similar to the vehicle reported. (Govt's Response p. 6 n. 3). (Emphasis added).[12] By the government's own terms, location and physical description of the vehicle provide reasonable suspicion for the stop. However, even assuming that Mr. Blackshaw and his

---

overhead patrol lights which prompted the passenger to attempt to flee, and prevented the passenger's flight does not bear the weight of scrutiny. Nor does Officer Cunningham's testimony regarding the sequence of events that might have justified the officer's reasonable suspicion comport with the audio-video evidence. Officer Cunningham testified that he arrested Mr. Blackshaw only after Officer Battle discovered crack cocaine in Ms. Burke's purse incident to a protective search of Ms. Burke's person. Yet, the audio-video evidence reveals that Mr. Blackshaw and Ms. Burke were already in handcuffs when Officer Battle discovered the contraband in Ms. Burke's purse.

12. The government relies on the following list of factors in arguing for reasonable suspicion:

1. Officers encountered defendant within two minutes of the 911 call;
2. Defendant's vehicle was on Euclid Avenue;
3. Defendant's vehicle was stopped less than one-tenth of a mile from Hastings Avenue;
4. Defendant's vehicle was similar to the description; and
5. Defendant was wearing a white tee-shirt and blue jeans matching the description.

Even assuming these factors bear the weight of scrutiny, they amount to no more than the location and description evidence found inadequate by the Court in *J.L.*

Cadillac fully matched the given description, without more than an anonymous call that lacked independent corroboration, the officers in this case failed to possess the "indicia of reliability" necessary under *J.L.*, to provide reasonable suspicion.[13]

The government largely relies upon *United States v. Lumpkin*, 159 F.3d 983 (6th Cir.1998), to argue for the warrantless search of Mr. Blackshaw's car. In *Lumpkin* the court found probable cause to suspect drug activity based on concise information from a confidential informant and independent corroboration by the officers of suspicious activity, which included: conflicting statements by the driver and passenger of the vehicle; $20,000 in currency in the vehicle; and, the passenger's admission to possession of a weapon. *Id.* At 986.

For reasons both factual and legal, *Lumpkin* flies wide of the mark. First, unlike the anonymous 911 call in this instance, the police in *Lumpkin* relied upon a confidential informant who had provided reliable information in the past. *Id.* Further, the informant provided Lumpkin's name and specific descriptions of his vehicle, including license plate number, the route traveled, Lumpkin's passenger and the contraband. *Id.*

As a legal matter, *Lumpkin* corroborates the Sixth Circuit's reluctance to find that a tip, alone, will provide sufficient probable cause. The *Lumpkin* Court specifically noted, "[p]robable cause may come

from a confidential informant's tip, when sufficiently detailed and corroborated by the independent investigation of law enforcement officers" *Lumpkin*, at 986. Consequently, *Lumpkin*, which involved a seasoned informant, actually establishes a higher legal standard for finding cause than does *J.L.*, which involved only an anonymous tip. However, both require sufficient detail from the tip coupled with independent corroboration to establish the necessary "indicia of reliability" to support an officer's reasonable suspicion to perform a *Terry* stop. As neither the detail nor the corroboration were present in this case to establish an "indicia of reliability," the evidence seized from Mr. Blackshaw's person and vehicle must be suppressed.

Accordingly, Mr. Blackshaw's Fourth Amendment rights were violated by the police officers' conduct and Mr. Blackshaw's motion to suppress will be granted.

### III. CONCLUSION

For the reasons discussed above, defendant's motion to suppress is granted.

IT IS SO ORDERED.

---

**13.** At the hearing, the government invited the court to consider the 911 call, at the heart of this case, a more reliable source than the anonymous tip involved in *J.L.* (Tr. II at 10–11). On several grounds the government's approach fails. First, the government provides no case law to substantiate its argument. Indeed, the case law of this Circuit does not establish any legally cognizable difference between an anonymous 911 call and an anonymous tip. The Sixth Circuit approach seems eminently reasonable given that both sources lack the indicia of reliability

sought, and often found, by the courts in cases involving tried and tested confidential sources. Both anonymous tipsters and 911 callers provide unproven information of the kind that requires independent police corroboration. An anonymous 911 call is no more authentic nor reliable than an anonymous tip simply because it was allegedly made in immediate response to the incident reported. Indeed, a 911 caller may prove even less reliable than a tipster, given the exigencies of the moment that prompted the 911 call.