**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 07a0432n.06**
**Filed: June 20, 2007**

**No. 06-6067**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **SRIRASACK SRISAVATH,** | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee,* | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| **CITY OF BRENTWOOD; JOHN MAXWELL,** | ) | **O P I N I O N** |
| **BPD Officer; T. CAMPSEY, Det. BPD,** | ) | |
| | ) | |
| *Defendants,* | ) | |
| | ) | |
| **SGT. WILLIAM RICHARDSON, BPD,** | ) | |
| | ) | |
| *Defendant-Appellant.* | ) | |

BEFORE:    SILER, MOORE, and COLE, Circuit Judges.

**R. GUY COLE, JR., Circuit Judge.** Plaintiff-Appellee Srirasack Srisavath brought suit against Defendant-Appellant Sergeant William Richardson under 42 U.S.C. § 1983, alleging that Richardson violated Srisavath's Fourth Amendment rights upon stopping Srisavath's vehicle and arresting him in response to an anonymous tip. The district court denied Richardson's motion to dismiss the complaint based on qualified immunity, and we affirmed. After discovery, Richardson moved for summary judgment based on qualified immunity, and the district court denied the motion. The district court also denied Richardson's motion to reconsider the denial of summary judgment, and Richardson again appealed. For the reasons discussed below, the district court correctly

determined that Richardson violated Srisavath's Fourth Amendment rights, that the rights involved were clearly established, and that Richardson's conduct was objectively unreasonable. Accordingly, Richardson is not entitled to qualified immunity. We therefore **AFFIRM** the district court's denial of summary judgment.

## I. BACKGROUND

### A.    Facts

Around midnight on October 30, 1997, Sergeant William Richardson was dispatched to the Extended Stay Hotel, located at the corner of Church Street and Summit View Place in Brentwood, Tennessee. *State v. Srisavath*, No. M2000-02159-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 175 at *1–2 (March 8, 2001). The dispatch was in response to a tip from an anonymous telephone caller who advised that "there were six to eight teenagers in baggy pants running around [the hotel parking lot] looking into parked cars." *Id.* at *2. While driving his patrol car on Church Street, Richardson observed a car, driven by Srisavath and carrying three male passengers, turn from Summit View Place onto Church Street. *Id.* After seeing no other cars in the section of the hotel parking lot that was visible to him, Sergeant Richardson turned around his patrol car and pulled over the vehicle Srisavath was driving on Church Street. *Id.* Another police officer joined Richardson at the scene of the traffic stop. *Id.* After this other officer saw the front-seat passenger lean forward, he searched the interior of the vehicle and found a bag of marijuana under the seat. *Id.*

Srisavath was convicted in Tennessee court for possession of marijuana with intent to sell and was sentenced to one and a half years in prison and assessed a $2,000 fine. *Id.* at *1. The Tennessee Court of Criminal Appeals reversed Srisavath's conviction, holding that "the totality of

the circumstances did not warrant an investigatory stop" and that the trial court therefore erred in not suppressing the evidence against Srisavath. *Id.* at *8.

## B.     Procedural History

On March 7, 2002, Srisavath brought suit in district court under § 1983, alleging that Richardson violated his rights under the Fourth Amendment to the United States Constitution and Article 7 of the Tennessee Constitution by making an illegal traffic stop and conducting an illegal search of the vehicle Srisavath was driving.  Srisavath sought compensatory and punitive damages totaling $750,000.  Richardson moved to dismiss Srisavath's complaint based on the defense of qualified immunity.  The district court denied the motion to dismiss, concluding that Srisavath pleaded sufficient facts to overcome the qualified-immunity defense.  Richardson then appealed to this Court, which affirmed, holding that the investigatory stop was unconstitutional, the constitutional right involved was clearly established, and Richardson's actions were objectively unreasonable. *Srisavath v. Richardson*, 115 F. App'x 820, 822–824 (6th Cir. 2006).  We noted that Richardson could still, of course, move for summary judgment in the district court and "raise an affirmative defense of qualified immunity and support his motion with additional materials outside of Srisavath's Complaint." *Id.* at 824 n.1.

Following discovery, Richardson filed this summary judgment motion, which the district court denied, again concluding that Richardson was not entitled to qualified immunity.  Richardson contended that he did not know the dispatcher had received an anonymous tip until after he had arrested Srisavath.  The district court explained, however, that "the evidence . . . is inconsistent concerning whether or not Sgt. Richardson was aware that the tip was anonymous."  At his

deposition, Richardson first testified that "the dispatcher said she had received an anonymous phone call . . . ." (Joint Appendix ("JA") 366.) However, Richardson then responded affirmatively to Srisavath's counsel's statement that "you said just a while ago that there was an anonymous phone call, which you learned later, didn't you?" (JA 377.) In light of Richardson's conflicting testimony, the district court, required on summary judgment to view conflicting facts in the light most favorable to the plaintiff, relied on Richardson's first statement in which he said that he was aware the information relayed by the dispatcher came from an anonymous tip.

Richardson moved for reconsideration and filed an affidavit in support stating that he did not remember if the dispatcher told him that the call was from an anonymous tipster. He further averred, "with some degree of certainty," that the dispatcher would not have identified the caller as anonymous but would have provided the identity of the person making the call. (JA 292.) The district court denied the motion to reconsider.

Richardson now brings this interlocutory appeal. We have jurisdiction because a district court's denial of qualified immunity that depends on an issue of law is "an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

## II. DISCUSSION

### A. Standard of Review

We review a district court's denial of summary judgment de novo. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment has the burden of proof and must demonstrate that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Denial of qualified immunity is an issue of law reviewed de novo. *Pray v. City of Sandusky*, 49 F.3d 1154, 1157 (6th Cir. 1995). Where there is disagreement about the facts, we must review the evidence in the light most favorable to the plaintiff, taking all inferences in his favor. *Swiecicki v. Delgado*, 463 F.3d 489, 497 (6th Cir. 2006) (citing *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004)).

### B. Qualified Immunity

It has long been recognized that government officials need protection "to shield them from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). One form of protection that a public official has is qualified immunity, an affirmative defense that the official must plead. *Id.* at 815. Qualified immunity shields officials performing discretionary functions from civil liability where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818.

When a defendant raises the qualified-immunity defense, it is the plaintiff's burden to show that the official is not entitled to qualified immunity. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). To determine if an official is entitled to qualified immunity, the Supreme Court applies a two-prong test. First, the plaintiff must show that the facts, taken in the light most favorable to the plaintiff, demonstrate that the officer's conduct violated a constitutional right.

*Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, the plaintiff must show that right at issue was clearly established. *Id.* On occasion, this Court adds a third prong to the *Saucier* test, examining "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005). Where the right involved is clearly established, however, it can often be inferred that the conduct involved is objectively unreasonable, and some panels have thus "'collapse[d] the second and third prongs' in an effort to 'avoid duplicative analysis.'" *Miller v. Admin. Office of the Courts*, 448 F.3d 887, 894 (6th Cir. 2006) (quoting *Caudill v. Hollan*, 431 F.3d 900, 911 n.10 (6th Cir. 2005)).

As discussed below, we conclude that (1) by conducting a *Terry* stop without the necessary reasonable suspicion, Richardson violated Srisavath's constitutional rights; (2) these rights were clearly established; and (3) Richardson's conduct was objectively unreasonable because his basis for the *Terry* stop was an uncorroborated anonymous tip, and other circumstances he relied upon are insufficient to provide the reasonable suspicion required by the Fourth Amendment.

1.      Constitutional Violation

We must first determine whether Richardson violated Srisavath's constitutional rights. *Estate of Carter*, 408 F.3d at 311. Fourth Amendment protections apply when police officers make brief investigatory stops of a vehicle. *United States v. Cortez*, 449 U.S. 411, 417 (1981). Police officers are permitted to make these investigatory stops when they have "reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *United States v. Hensley*, 469 U.S. 221, 227 (1985). When police officers make stops of individuals based on

reasonable suspicion of criminal activity, they are said to have made a *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968). The Supreme Court has explained that "the level of suspicion required for a Terry stop is obviously less demanding than that for probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *see also Alabama v. White*, 496 U.S. 325, 330 (1990) (noting that reasonable suspicion "can be established with information that is different in quantity or content than that required to establish probable cause" and that "reasonable suspicion can arise from information that is less reliable than that required to show probable cause"). Yet reasonable suspicion requires more than a police officer's hunch that criminal activity is afoot. Instead, the officer must be able to point to "specific and articulable facts [that], taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Whether an officer had reasonable suspicion for a *Terry* stop is examined in light of the totality of the circumstances surrounding the stop. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

An anonymous tip can form the basis for the reasonable suspicion needed for an officer to perform a traffic stop. *Alabama v. White*, 496 U.S. 325 (1990). But the Supreme Court has also recognized that, "[u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'" *Florida v. J.L.*, 529 U.S. 266, 270 (2002) (quoting *White*, 496 U.S. at 329); *see also United States v. Payne*, 181 F.3d 781, 790 (6th Cir. 1999) (noting that courts generally have been willing to find reasonable suspicion on the basis of an informant having a proven record of providing police officers with reliable information). Consequently, "[s]ome tips, completely lacking in indicia of reliability, would either warrant no

police response or require further investigation before a forcible stop of a suspect would be authorized." *White*, 496 U.S. at 329 (internal citation omitted).

*White* provides an example of when the Supreme Court has found that police officers sufficiently corroborated an anonymous tip to provide reasonable suspicion for a *Terry* stop. In that case, a police officer received an anonymous telephone call stating that the defendant would be leaving a specific apartment building at a particular time in a brown Plymouth station wagon with the right tail light broken, driving to an identified motel, and have an ounce of cocaine inside a brown attaché case. *Id.* at 327. The police proceeded to this apartment building and saw a brown Plymouth station wagon with a broken right tail light in the parking lot in front of the building. *Id.* The officers observed the defendant leave the building, carrying nothing in her hands, and enter the station wagon. *Id.* They followed the vehicle as it drove the most direct route to the motel that the caller had described. *Id.* The officers stopped the station wagon just before it reached the motel, and the defendant consented to a search of the car, which uncovered a brown attaché case containing marijuana. *Id.* Additionally, during processing at the police station, a small amount of cocaine was found in the defendant's purse. *Id.*

The Court held that although the anonymous tip offered no way to determine whether the caller was honest or reliable, the officers sufficiently corroborated the tip to have reasonable suspicion that the defendant was engaged in criminal activity. *Id.* at 331. The Court also deemed it important that "the anonymous tip contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." *Id.* at 332 (citation omitted). Ultimately, "[a]lthough it [was] a close case," the

Court concluded that "under the totality of the circumstances[,] the anonymous tip, as corroborated, exhibited sufficient indicia of reliability to justify the investigatory stop of respondent's car." *Id.*

In a more recent case, the Supreme Court reaffirmed these principles and held that an anonymous tip was insufficient to justify the conduct of a police officer who stopped and frisked the defendant to search for a weapon. *Florida v. J.L.*, 529 U.S. 266, 268 (2000). There, all the anonymous caller told the police was that a young, black male, wearing a plaid shirt and sitting at a particular bus stop, was carrying a gun. *Id.* The police arrived about six minutes later and saw three black males "just hanging out." *Id.* One of three, the defendant, was wearing a plaid shirt. *Id.* With no basis besides the tip to suspect the three of illegal conduct, an officer frisked the defendant and seized a gun from his pocket. *Id.* The defendant was convicted of carrying a concealed weapon without a license. *Id.* The Florida Supreme Court ultimately held that the search violated the Fourth Amendment.

The Supreme Court affirmed, noting that the basis for reasonable suspicion was more tenuous than in the "borderline case" presented in *White*. *Id.* at 271. The Court explained that the anonymous tipster in *J.L.* "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." *Id.* at 271. Moreover, it was insufficient that the tipster's description of the defendant proved accurate. As the Court explained, reasonable suspicion "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272.

This Court recently explained that the "close case" in *White* serves as a line between proper and improper *Terry* stops in this context: "[A]ny tip that did not rise to the level of [the] tip in *White*

would be insufficient to justify a *Terry* stop." *United States v. Atchely*, 474 F.3d 840, 848 (6th Cir. 2007). Thus, anonymous tips that can be independently verified and that demonstrate knowledge of future activity can be sufficient to establish the reasonable suspicion necessary for investigative detention. *See, e.g., United States v. Braggs*, 23 F.3d 1047 (6th Cir. 1994) (holding that officers had reasonable suspicion where they corroborated caller's details regarding specific address from which defendants would depart, gave their approximate description, stated that they would be traveling in a white car with temporary license plates, and that the purpose of the trip was to consummate a drug transaction). On the other hand, when anonymous tips provide the police with vague information that is not predictive of future illegal activity, this Court refuses to hold that officers have reasonable suspicion to conduct a *Terry* stop. *See, e.g., United States v. Patterson*, 340 F.3d 368 (6th Cir. 2003) (holding that police lacked reasonable suspicion to detain group of men on a street corner known for drug activity five hours after anonymous caller stated that a group of men was at that corner selling drugs); *cf. United States v. Graham*, 483 F.3d 431, 439 (6th Cir. 2007) (declining to hold that anonymous tip, which correctly identified the defendant at a particular location, alone created reasonable suspicion for *Terry* stop; but upholding stop because of additional factors, including defendant's "furtive movement" that was consistent with placing something under his seat).

An anonymous-tip case that reached this Court in nearly the identical procedural posture as the present one is *Feathers v. City of Akron*, 319 F.3d 843 (6th Cir. 2003). *Feathers* provides useful guidance here for each of the three steps in the qualified-immunity analysis. At 1:25 a.m., city officials received a 911 call reporting that moments earlier, a white, bearded male on a porch on North Howard Street had pointed something at the caller and told the caller to shut up. *Id.* at 846.

The caller said the individual "looks like he is pretty drunk" and said that, although he did not know the address from which the individual had spoken, the house was two houses from the corner. *Id.* The caller, who claimed that he was just walking along the street when the individual spoke to him, refused to identify himself by name but suggested that the officials could "have somebody come by here." *Id.* The dispatcher then instructed a patrol car near the area to approach 708 North Howard Street and "check for a signal 9 [suspicious person], supposed to be carrying a weapon . . . . Signal 9 is on the porch near the corner, it's a white male with a beard, no shirt, possible 4 [intoxicated person], he pointed something at a caller, so he possibly has a weapon." *Id.* at 846 & n.1

In response, two officers went to 708 North Howard, and, after determining that it was the wrong address, saw on a nearby porch an individual who one officer believed matched the dispatcher's description, and they pulled their car over to 728 North Howard. *Id.* at 846. When the officers arrived, the plaintiff and his wife were standing on one side of the porch, hugging. *Id.* The plaintiff was not wearing a shirt. *Id.* The officers approached the porch and shouted at the plaintiff to move from one end of the porch to the other, and he complied. *Id.* They ordered the plaintiff to take his hands out of his pockets, but the plaintiff failed to do so. *Id.* They repeated the instruction, and the plaintiff took his hands out and then put them back into his pockets. *Id.* The officers repeated the instruction for a third time. *Id.* The plaintiff then turned away and, removing his hands from his pockets, went back toward the door that led into his house. *Id.* Opening the door with his right hand, the plaintiff leaned into his house and told his father, who was inside, to come out quickly and to bring their video camera. *Id.* At this point, the officers ran up the porch stairs and seized him from behind while he was leaning into the house. *Id.* A scuffle ensued, and other officers eventually

helped wrestle the plaintiff to the ground. *Id.* at 847. The officers cuffed him, and, when searching his pockets, found a Leatherman utility knife in his pocket. *Id.* The plaintiff was charged with assault against a peace officer, carrying a concealed weapon, and resisting arrest. *Id.* At trial the concealed-weapon and resisting-arrest charges were dismissed, and a jury acquitted the plaintiff of the assault charge.

The plaintiff filed a § 1983 action against the city and the officers. His allegations included that the officers violated his Fourth Amendment rights when seizing him with a *Terry* stop in response to the anonymous call. *Id.* The district court denied the officers' motion for summary judgment, rejecting their claim that they were entitled to qualified immunity. On appeal, this Court engaged in the three-step, qualified-immunity inquiry.

With regard to the first step, we concluded that the arresting officers violated the plaintiff's constitutional rights. The officers did not know that the dispatcher's information was from an anonymous tipster who offered no evidence of reliability. *Id.* at 849. But for purposes of determining whether the *Terry* stop was reasonable, we imputed to the officers the dispatcher's knowledge that the tip was anonymous. *Id.* (discussing *United States v. Hensley*, 469 U.S. 221 (1985) (noting that reasonable suspicion based on a bulletin from other officials is reasonable to the extent that the bulletin itself was based on articulable facts that would support reasonable suspicion)). Thus, if the dispatcher had sufficient information to find reasonable suspicion for a *Terry* stop, the stop was permissible; if not, the stop violated the plaintiff's Fourth Amendment rights. *Id.*

Relying on the Supreme Court decisions in *White* and *J.L.*, we explained that the officers did not have sufficient information when relying on the anonymous tip to support a finding of reasonable suspicion. *Id.* In particular, "the informant offered no future predictions or inside information that would suggest a special knowledge of [the plaintiff's] allegedly criminal activity." *Id.* at 850. "Indeed," the Court explained, "the anonymous tipster did not even allege *any* criminal activity; it was the dispatcher, not the tipster, who suggested that [the plaintiff] might be carrying a weapon." *Id.* The Court also rejected the officers' argument that by corroborating the information from the tip (finding a shirtless white male on North Howard Street), they had reasonable suspicion: "[T]he only information they corroborated"—regarding the plaintiff's identity, but not predictions of future behavior—"is precisely the information that the Supreme Court ruled fails to support reasonable suspicion in an anonymous tip." *Id.* Thus, we concluded, the officers violated the plaintiff's Fourth Amendment rights.

Likewise, in the present case, Sergeant Richardson did not have the reasonable suspicion necessary to effect a *Terry* stop. Before addressing this issue further, however, one crucial factual issue must be reiterated: Richardson testified at his deposition that the dispatcher told him the tip was anonymous:

> Q.     Now, in this call, the only thing you got was what?
>
> A.     *The dispatcher said she had received an anonymous phone call* that there were several teen-agers standing out by the cars, standing around the cars as if looking at—looking in them or something like that.

(JA 366 (emphasis added).) To be sure, just a few questions later, Richardson appeared to contradict this statement:

> Q.  And the dispatcher on the night—you said just a while ago that there was an anonymous phone call, *which you learned later*, didn't you?
>
> A.  Yes, sir.

(*Id.* 367 (emphasis added).) Additionally, Richardson now suggests that his first statement was inaccurate, stating in his affidavit that he does not recall ever receiving a dispatch communication about an anonymous tip and that he does not recall exactly what happened in this case.

But where there is disagreement about the facts, this Court must review the evidence in the light most favorable to Srisavath, taking all inferences in his favor. *Swiecicki*, 463 F.3d at 497 (citing *Champion*, 380 F.3d at 900). Thus, this Court should assume Richardson's first deposition statement on this point to be true—that he knew the tip was anonymous. With this understanding, it is evident that Richardson lacked reasonable suspicion to make the *Terry* stop.

First, the tip was so vague as to be unreliable. The dispatcher told Richardson that there were six to eight teenagers wearing baggy pants who were looking into cars parked in the hotel's parking lot. This description is even less detailed than those held insufficient in *J.L.* ("young black male at a bus stop wearing a plaid shirt") and *Feathers* ("white male with a beard on a porch" wearing no shirt and at a certain address). It describes nothing more than nondescript, "easily obtained facts and conditions existing at the time of the tip." *White*, 496 U.S. at 332. Additionally, it did not predict any future behavior. Neither did it communicate any illegal activity, as Richardson admitted in his deposition when discussing the dispatcher's call:

- 14 -

Q.     All right.  Now, of course, there was not any report of any crime being committed, was there?

A      Not at that time; no sir.

Q.     And there was no report that a crime was about to be committed, was there?

A.     No sir; there was not.

(JA 366.)

Worse, as bare as this tip was, Richardson failed to corroborate what little information it did provide.  He testified at deposition that he scanned the hotel's front parking lot, observed nobody around, and so turned around to stop the car he saw leaving the parking lot.  However, Richardson neglected to examine the hotel's rear parking lot to determine if there were teenagers on that part of the property looking into cars.  In addition, Richardson testified that he did not make any independent observations of criminal activity that would have provided the reasonable suspicion necessary for a *Terry* stop.  Indeed, Srisavath had left the hotel's parking lot by the time Richardson arrived, and Richardson first observed the vehicle driven by Srisavath as it turned from Summit View Place onto Church Street.  Srisavath had not committed any traffic violation that would have entitled Richardson to stop Srisavath's vehicle, and Richardson had not received any report that a vehicle matching the description of that driven by Srisavath had been involved in a crime.  He conceded in his deposition that when he observed Srisavath's vehicle, he could not be sure that the individuals inside matched the description of the people observed by the anonymous caller.

Moreover, the totality of the circumstances in addition to the tip do not serve as a basis for reasonable suspicion.  Richardson testified that another basis for his reasonable suspicion was that

"[t]here had been so many burglaries in . . . this area and that[, seeing the vehicle] leaving at the same time that [he] was given a call, [he] had come to the conclusion that it possibly was a vehicle involved in something." (JA 393.) In addition, Richardson testified that his suspicions were aroused because Srisavath's vehicle was the only one that he saw exiting the hotel parking lot when he arrived. The relatively late hour at which he received the dispatch was also a factor that Richardson points to as a cause for his reasonable suspicion.

These factors are insufficient to provide the necessary reasonable suspicion. Srisavath's presence in an area where there had recently been automobile burglaries does not alone provide reasonable suspicion to conduct a *Terry* stop. *See Patterson*, 340 F.3d at 371 ("The problem arises when officers use vague information about an intersection already known as a 'hot spot' as the sole basis for reasonable suspicion to stop and frisk a person."); *cf. United States v. Cohen*, 481 F.3d 896, 900 (6th Cir. 2007) (analogizing 911 hang-up call to anonymous tip and explaining that, although the officers' "quick response" made it possible to limit those people potentially related to the 911 call "to those people and vehicles within four minutes of the area surrounding" the location of the call at that "early hour," "those limitations still fall short of identifying a determinate person"). These facts also fall short of those deemed insufficient in *Feathers*. At least in *Feathers* the officers observed the suspect in the location the tipster suggested. Here, Srisavath was in his car (not walking around looking in car windows); Richardson did not even know if Srisavath and his passengers matched the tipster's description.

In sum, Richardson stopped Srisavath's car on the basis of an anonymous tip that provided only a vague description of possible suspects, described no ongoing criminal activity, and offered

no prediction of future activity that could be used to determine the tipster's veracity and reliability. Once on the scene, Richardson did not corroborate the tip and observed no criminal activity to justify stopping Srisavath's car. Accordingly, Richardson lacked the reasonable suspicion necessary for a *Terry* stop, and the stop violated Srisavath's constitutional rights.

> 2.      <u>Clearly Established Right</u>

If a court finds that an official's conduct violated a plaintiff's rights under the Constitution, it must then determine whether the right at issue was clearly established. The Supreme Court has held that for a right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

In *Feathers*, after the Court determined that the officers violated the plaintiff's rights, it then concluded that those rights were clearly established. The Court explained that "*Terry*, which requires reasonable suspicion for investigative detentions, had been clearly established since 1968." *Feathers*, 319 F.3d at 850. Moreover, the Supreme Court issued the *White* decision in 1990 in which it held that officers had to corroborate the reliability of anonymous tips to have the reasonable suspicion necessary for investigative detention. *See id.* With the *J.L.* decision in 2000, the Court reiterated that officers could not rely on anonymous tips identifying a particular person and his or her location as the only justification for a *Terry* stop. *See id.* For these reasons, Srisavath's same rights were clearly established.

3.       Objective Reasonableness of the Action

The final prong of the qualified-immunity test requires this Court to consider whether Srisavath offered sufficient evidence to demonstrate that Richardson's conduct was objectively unreasonable in light of clearly established constitutional rights. *See Feathers*, 319 F.3d at 348. The objective-reasonableness standard requires that courts analyze claims of qualified immunity "on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendants' position could have believed that his conduct was lawful, in light of clearly established law and the information he possessed." *Pray*, 49 F.3d at 1158. Officers are entitled to qualified immunity if they made a reasonable decision, even if it was mistaken. *Id.* Moreover, this Court has stated that "'if officers of reasonable competence could disagree on [the] issue, immunity should be recognized.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 349 (1986)).

Again, *Feathers* is instructive. Although we concluded that the *Terry* stop violated the plaintiff's rights and that those rights were clearly established, we also concluded that the improper stop was not objectively unreasonable. Accordingly, we reversed the district court and held that the officers were entitled to qualified immunity. *Feathers*, 319 F.3d at 852. Crucial to this holding was the information the officers themselves had (ultimately providing a sufficient basis for reasonable suspicion) versus the information the dispatcher had (ultimately insufficient). The dispatcher informed the officers of a suspicious person who was possibly intoxicated and supposedly carrying a weapon. *Id.* at 851. This information, provided by an anonymous tipster, was not sufficient to create reasonable suspicion under *J.L.. Id.* But "*[t]he officers did not know that the dispatcher's information was from an anonymous tipster who offered no evidence of reliability.*" *Id.* at 849

- 18 -

(emphasis added). On the contrary, they presumed the information was accurate and reliable, and acted accordingly. *Id.* Based on that information, the totality of the circumstances would justify the *Terry* stop. *Id.* In sum, "although the stop violated the Fourth Amendment because the authorities' collective information did not amount to reasonable suspicion, [the plaintiff could not] prevail in a § 1983 suit because the individual defendants had a sufficient factual basis for thinking that they were acting consistently with *Terry*." *Id.* at 851.

This is where *Feathers* and the present case part ways: Richardson testified that *the dispatcher told him that her information was based on an anonymous call. Cf. Srisavath*, 115 F. App'x at 824 (Siler, J., dissenting) ("The fact that the officers [in *Feathers*] had not been told by the police dispatcher that the information came from an anonymous source was very significant in granting qualified immunity). To rely on the anonymous tip, Richardson had to take steps to check the tipster's veracity. As discussed, however, the tip at issue provided only readily observable facts and no predictions of future activity that Richardson could test. Moreover, the tip did not allege that criminal activity was ongoing. Richardson could not even identify the passengers in the car he stopped. Indeed, under these circumstances, one could fairly question whether Richardson could have stopped the car even if the informant *were an identified, trustworthy source*, such as another officer—the "close call" here, if any, would be whether Richardson would have reasonable suspicion of a crime even in that situation. Here, relying on the anonymous tip alone as the basis for a *Terry* stop was objectively unreasonable in light of established constitutional law. Accordingly, Richardson is not entitled to qualified immunity.

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of Richardson's motion

for summary judgment on the basis of qualified immunity.

**SILER**, Circuit Judge, dissenting. As the majority opinion states, this matter was previously remanded to the district court for consideration of qualified immunity after discovery. The evidence was inconclusive as to what Sgt. William Richardson had learned from the dispatcher before he responded. In a deposition, Richardson testified that the dispatcher said that she had received an anonymous phone call. Later, however, he filed an affidavit that he did not remember if he was told by the dispatcher that the call was from an anonymous source. Therefore, for purposes of summary judgment, we review the evidence in the light most favorable to the non-movant, Srisavath. See *Swiecicki v. Delgado*, 463 F.3d 489, 497 (6th Cir. 2006). Under that scenario, we assume that Richardson knew that the source was anonymous.

Nevertheless, as I stated in the previous dissent, the actions of Richardson were not objectively unreasonable. "[T]he question is whether 'any officer in the defendant's position measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct.'" *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994). Several factors weigh in favor of Richardson's determination that he had a reasonable suspicion to stop the car in which Srisavath was traveling: the time of night, the high number of auto burglaries in the area, and the absence of other cars in the parking lot of the hotel. As Srisavath's car was the only one moving in the vicinity, Richardson was fully justified in making the investigatory stop. Officers who react to tips have to move fast, or else the suspects will be out of sight.

Even the courts have disagreed on whether Richardson's conduct was objectively reasonable. For instance, the Tennessee trial court found no constitutional fault with the stop in question, although it was later reversed by the Tennessee Court of Criminal Appeals, which ruled that "The

issue is close." Therefore, like this court in *Feathers v. Aey*, 319 F.3d 843 (6th Cir. 2003), I would find that Sgt. Richardson acted objectively reasonable in conducting the investigative stop and is entitled to qualified immunity.