RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0049P (6th Cir.)
File Name: 03a0049p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

THOMAS L. FEATHERS;
KATHLEEN FEATHERS,
          *Plaintiffs-Appellees,*

          *v.*

WILLIAM AEY; J. P.
DONOHUE,
          *Defendants-Appellants,*

CITY OF AKRON,
          *Defendant.*

No. 02-3368

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 01-02081—James Gwin, District Judge.

Argued: December 13, 2002

Decided and Filed: February 13, 2003

Before: BATCHELDER and MOORE, Circuit Judges;
FORESTER, Chief District Judge.

---

*The Honorable Karl S. Forester, Chief United States District Judge
for the Eastern District of Kentucky, sitting by designation.

1

————————————————

**COUNSEL**

**ARGUED:** Bruce H. Christensen, Jr., CITY OF AKRON, DEPARTMENT OF LAW, Akron, Ohio, for Appellants. Paul R. Reiners, Canton, Ohio, for Appellees. **ON BRIEF:** Bruce H. Christensen, Jr., John C. Reece, CITY OF AKRON, DEPARTMENT OF LAW, Akron, Ohio, for Appellants. Paul R. Reiners, Canton, Ohio, for Appellees.

————————————————

**OPINION**

————————————————

KAREN NELSON MOORE, Circuit Judge.  Defendants William Aey and J.P. Donohue, both officers in the City of Akron Police Department, appeal from the district court's denial of summary judgment in a 42 U.S.C. § 1983 suit brought by plaintiffs Thomas and Kathleen Feathers.  The district court refused to grant the officers qualified immunity, ruling that the officers violated Thomas Feathers's ("Feathers") clearly established rights to be free from an unreasonable seizure and to be free from an arrest without probable cause.  Because the officers were entitled to qualified immunity protection with respect to both their initial seizure of Feathers and his subsequent arrest, we **REVERSE** the district court on Feathers's Fourth Amendment claims.

## I.  BACKGROUND

Taken in the light most favorable to Feathers, the facts are as follows.  At approximately 1:25 in the morning on August 31, 2000, Akron officials received a 911 call reporting that moments earlier, a white male with a beard on a porch on North Howard Street had pointed something at the caller and told the caller to shut up.  The caller said that the individual "looks like he is pretty drunk," and said that although he didn't know the address from which the individual had spoken, the house was two houses from the corner.  Joint

### III. CONCLUSION

Although Feathers's Fourth Amendment right to be free from an unreasonable seizure was violated when the *Terry* stop was executed without reasonable suspicion, Officers Aey and Donohue were entitled to qualified immunity because their behavior was objectively reasonable even in light of the constitutional rights at stake. Further, the officers did not violate Feathers's right to be free from an arrest without probable cause. On both claims, we **REVERSE** the district court.

Appendix ("J.A.") at 70. The caller, who claimed that he was just walking along the street when the individual spoke to him, refused to identify himself by name but suggested that "you can have somebody come by here." J.A. at 70. The dispatcher then instructed a patrol car near the area to approach 708 North Howard Street and "check for a signal 9, supposed to be carrying a weapon. . . . Signal 9 is on the porch near the corner, it's a white male with a beard, no shirt, possible 4, he pointed something at a caller, so he possibly has a weapon."[1] J.A. at 71.

Officers William Aey and J.P. Donohue were in a patrol car nearby and informed the dispatcher that they would go to the address. After determining that 708 North Howard was the wrong address, Aey saw on a nearby porch an individual who Aey believed matched the dispatcher's description, and they pulled their car over to 728 North Howard. When the officers arrived, Thomas Feathers and his wife, Kathleen Feathers, were standing on one side of the porch, hugging. Feathers was wearing shorts and sandals, but no shirt.

The officers approached the porch and shouted at Feathers to move from one end of the porch to the other. Feathers complied, moving to the side of the porch nearest the porch stairs and the entrance to the house. The officers, ignoring Kathleen's questions about why they were there, ordered Feathers to take his hands out of his pockets. Feathers did not remove his hands on their first instruction. They repeated the instruction; Feathers claims that, on the repeated instruction, "[I] took my hands out and by habit just put them back in." J.A. at 363. When he put his hands back in his pockets again, the officers — still standing at the base of the porch stairs — instructed him once more to take his hands out of his pockets.

After receiving this order a third time, Feathers turned away and, removing his hands from his pockets, went back toward the door that led into his house. Opening the door with his

---

[1] According to the officers' brief, a signal 9 is a suspicious person, and a signal 4 is an intoxicated person. Appellants Br. at 6.

right hand, Feathers leaned into his house and told his father, who was inside, to come outside quickly and to bring their video camera. The officers ran up the porch stairs and seized him from behind while he was leaning into the house. Officers Aey and Donohue each grabbed one of his arms and pinned him, face-forward, against a pillar. One of Aey's hands was placed against Feathers's shoulders and neck in order to prevent Feathers from head-butting them, and at some point during the scuffle Aey's pinky finger was bitten, breaking the skin on both sides. Aey states that Feathers turned his head and bit Aey's pinky, but Feathers — somewhat incredibly — suggests that Aey bit his own finger. For summary judgment purposes, suffice it to say that when the officers and Feathers emerged from the fracas, someone had bitten Officer Aey's finger.

Once they had pinned Feathers against the pillar, Donohue called for other officers. The other officers, who were on their way pursuant to the original dispatch, arrived within a matter of seconds and helped wrestle Feathers to the ground, face down, where they handcuffed him. At that point, the newly arriving officers stated that they could smell alcohol on Feathers's breath. Feathers was handcuffed and transported to a cruiser. When the officers searched his pockets, they found that Feathers, a carpenter, had a Leatherman utility knife in his pocket.

Feathers was charged with assault against a peace officer, carrying a concealed weapon, and resisting arrest. At trial, the concealed weapon and resisting arrest charges were dismissed, and Feathers was acquitted by a jury on the charge of assaulting a police officer.

On August 30, 2001, Feathers and his wife filed a suit under 42 U.S.C. § 1983, naming the City of Akron and Officers Aey and Donohue as defendants. Feathers alleged that Aey and Donohue violated his Fourth Amendment rights, that the City failed to train the officers properly, and that the officers violated various state law rights. In his deposition, Feathers discussed a number of harms that he suffered from

*United States v. Dotson*, 49 F.3d 227, 230 (6th Cir.) (ruling that, when officer grabbed suspect as the suspect began to run, the officer's "effort to restrain Dotson was an appropriate degree of force to effectuate the *Terry* stop"), *cert. denied*, 516 U.S. 848 (1995). Although Feathers explains that he was not attempting to flee, but merely calling for a video camera, his acknowledged motions — moving away from the officers, opening the door to his house, and moving to some degree into the interior — gave the officers sufficient reason to believe that he was fleeing and that the only way to complete their *Terry* stop would be to seize him. *See Houston v. Clark County Sheriff Deputy John Does*, 174 F.3d 809, 815 (6th Cir. 1999) ("[B]*ased upon the facts known to the officers at the time of the stop*, their use of handcuffs and their detention of the men in the cruisers were both reasonably necessary to protect the officers' safety during the investigation.") (emphasis added). At this point, because there was no arrest, the officers did not need to have probable cause.

The officers did not arrest Feathers until after the three of them had wrestled and Officer Aey had been bitten. By the time they arrested him, however, the officers had good reason — in the form of Officer Aey's punctured finger — to believe that Feathers had bitten Officer Aey. This provided the necessary probable cause for an arrest under Ohio Rev. Code § 2903.13(A) and § 2903.13(C)(3), which make it a fourth degree felony to "knowingly cause or attempt to cause physical harm" to a peace officer.

Because the officers had probable cause to arrest Feathers for assaulting a police officer, they did not violate his rights in this regard. Accordingly, the district court erred in holding that the officers were not entitled to qualified immunity.

---

from arresting those who commit crimes *during* an unconstitutional search, seizure, or interrogation. If the doctrine did cover such situations, an individual who is unconstitutionally seized would have license to commit any offense he or she desired and could not be arrested for it.

succeed under § 1983, a plaintiff must prove that the police lacked probable cause. A police officer has probable cause if there is a fair probability that the individual to be arrested has either committed or intends to commit a crime." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (internal quotation and citations omitted).

In order to determine whether the officers had probable cause when they arrested Feathers, we must determine when the officers' *Terry* stop escalated into an arrest. Although the officers initially laid their hands on Feathers when he opened the door to his house, "the mere use or display of force in making a stop will not necessarily convert a stop into an arrest." *United States v. Hardnett*, 804 F.2d 353, 357 (6th Cir. 1986), *cert. denied*, 479 U.S. 1097 (1987). In order to determine whether that confrontation at the doorway indicated the escalation of the *Terry* stop into a full-fledged arrest, we must determine whether the use of force was "reasonably related in scope to the situation at hand," *id.* at 356, or, in other words, whether the degree of intrusion was necessary in order to effectuate the *Terry* stop. If the force was necessary to effect the *Terry* stop, we consider it part of the *Terry* stop; if the force went beyond that necessary for the *Terry* stop, we interpret it as a signal that the confrontation had escalated into an arrest. Under these circumstances, we believe that the officers' pursuit and seizure of Feathers as he moved toward and opened the door into his house were necessary in order to complete their investigative detention under *Terry*.[2] *See*

---

[2] Although the *Terry* stop was invalid, we nonetheless must look to it in determining the point at which the stop escalated into an arrest. If we simply accepted that because the *Terry* stop was unconstitutional, no show of force — whether with words, physical force, or firearms — could be reasonably related to the purpose of the *Terry* stop, then *every* unconstitutional *Terry* stop would necessarily be an unconstitutional arrest. Thus in order to determine the point at which Feathers was under arrest, we look to whether the force was reasonably related to the *Terry* stop's purpose. It is for a similar reason that the "fruit of the poisonous tree" doctrine, which was relied upon below and which bars the introduction of evidence that is the product of an unconstitutional search, seizure, or interrogation, cannot apply in this context to prevent officers

the incident, including his legal expenses from the criminal charges, recurring nightmares since the incident, and his eventual move from the city as a result of police intimidation. The district court dismissed the claim against the city, the state law claims, and the claims by Kathleen, but the court denied Aey's and Donohue's motion for summary judgment with respect to the constitutional claim. Finding that, for summary judgment purposes, the facts showed that the officers had seized Feathers based only on unverified anonymous tipster's 911 call, the district court determined that the officers had violated Feathers's clearly established Fourth Amendment rights under *Terry v. Ohio*, 392 U.S. 1 (1968). The district court also found that Feathers's arrest arose from the impermissible seizure. Accordingly, the court rejected the officers' claim that they were entitled to qualified immunity and denied their motion for summary judgment.

The officers timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291 and *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), which provides that a district court's denial of qualified immunity, to the extent that it involves a question of law, is an appealable final order. Federal appellate courts have jurisdiction to hear interlocutory appeals concerning "the legal question of qualified immunity, i.e., whether a given set of facts violates clearly established law." *Mattox v. City of Forest Park*, 183 F.3d 515, 519 (6th Cir. 1999). We review a district court's denial of qualified immunity de novo. *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001), *cert. denied*, 123 S. Ct. 95 (2002).

## II. ANALYSIS

We must evaluate Feathers's claims under the framework of qualified immunity. According to the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity involves a

three-step inquiry. First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996)); *see also Saucier v. Katz*, 533 U.S. 194 (2001).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). "Although it need not be the case that 'the very action in question has been previously held unlawful, . . . in the light of pre-existing law the unlawfulness must be apparent.'" *Id.* (quoting *Anderson*, 483 U.S. at 640). As the Supreme Court noted in *Hope v. Pelzer*, __ U.S. __, 122 S. Ct. 2508, 2516-17 (2002), an action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs.

## A. The *Terry* Stop

Feathers alleges that the officers' initial *Terry* stop violated his Fourth Amendment rights. Specifically, Feathers claims that the officers lacked the necessary reasonable suspicion when, immediately upon arriving at Feathers's residence, they performed an investigative stop and search under *Terry v. Ohio*, 392 U.S. 1 (1968), by ordering Feathers to come to the near side of the porch and remove his hands from his pockets.

The parties disagree over whether this claim is properly characterized as an "anonymous tip" case or as a "dispatcher"

Nonetheless Feathers cannot overcome the officers' qualified immunity. Aey's and Donohue's behavior was not objectively unreasonable, even in light of the clearly established rights, as *Williams v. Mehra*, 186 F.3d at 691, requires before a plaintiff can overcome qualified immunity. Based on the information that Aey and Donohue had themselves, the *Terry* stop was reasonable. The dispatcher informed the officers of a suspicious person who was possibly intoxicated and supposed to be carrying a weapon. Although this information was from an anonymous tipster, whose information was not sufficient to create reasonable suspicion under *J.L.*, the officers knew only what had been reported from the dispatch, and efficient law enforcement requires — at least for the purposes of determining the civil liability of individual officers — that police be permitted to rely on information provided by the dispatcher. If the dispatcher's information were accurate and reliable, as the police presumed, the totality of circumstances would justify the *Terry* stop. This is precisely the scenario contemplated in *Hensley*, in which, after reasoning that a stop based on a bulletin that was itself issued in the absence of reasonable suspicion would violate the Fourth Amendment, the Supreme Court stated that, "[i]n such a situation, of course, the officers making the stop may have a good-faith defense to any civil suit." *Hensley*, 469 U.S. at 232. So although the stop violated the Fourth Amendment because the authorities' collective information did not amount to reasonable suspicion, Feathers cannot prevail in a § 1983 suit because the individual defendants had a sufficient factual basis for thinking that they were acting consistently with *Terry*. Although there might be a legitimate question about whether the City should be held liable for a policy that does not inform dispatched officers of the reliability of their tip, the dismissal of the claims against the City is not before us.

## B. The Arrest

The officers' behavior in arresting Feathers is also protected by qualified immunity, because the officers did not violate Feathers's rights. "In order for a wrongful arrest claim to

to form a reasonable suspicion that justified a *Terry* stop. However, the only information that they corroborated is precisely the information that the Supreme Court ruled fails to support reasonable suspicion in an anonymous tip. Feathers's identity consisted of "easily obtained facts and conditions existing at the time of the tip, [not] future actions of third parties ordinarily not easily predicted." *White*, 496 U.S. at 332. Even when taken as a whole, the totality of the circumstances here do not support a finding of reasonable suspicion. An anonymous tip that an individual pointed something at a tipster does not support a finding of reasonable suspicion even when police find the described individual in the relevant area. The *Terry* stop thus violated Feathers's Fourth Amendment rights.

Second, the rights at issue here were clearly established when the incident occurred. Under *Hope v. Pelzer*, a right can be clearly established even if there is no case involving "fundamentally similar" or "materially similar" facts. *See* 122 S. Ct. at 2516. We see no exception in this analysis for the admittedly "somewhat abstract" problem of determining when the reasonable suspicion requirement is met, *Arvizu*, 534 U.S. at 274, because *Hope* specifically states that a right is clearly established when "[t]he reasoning, though not the holding," of a prior court of appeals decision puts law enforcement officials on notice, or when the "premise" of one case "has clear applicability" to a subsequent set of facts. *See Hope*, 122 S. Ct. at 2517. Here, this standard is met. *Terry*, which requires reasonable suspicion for investigative detentions, had been clearly established since 1968. The Supreme Court had emphasized the importance of establishing the reliability of anonymous tips in 1990 in *White* and had re-affirmed that principle in *J.L.*, decided just a few months before this incident. And the principle that an officer may rely on a dispatch for reasonable suspicion only to the extent that the dispatch is itself based on sufficient information had been established since *Hensley* in 1985. These premises clearly apply to the case at hand, and a reasonable officer would have been aware of the relevant rights.

case. Feathers argues that this is an anonymous tip case, because insofar as the officers' initial detention was based only on an unsubstantiated anonymous tip, the officers' knowledge was insufficient under *Florida v. J.L.*, 529 U.S. 266, 268 (2000), to justify a *Terry* stop. The officers argue that this is a dispatcher case, because insofar as the officers' knowledge was based only on the initial dispatch, they could not have known that the tip at issue was anonymous. We agree with Feathers, that for purposes of determining whether the *Terry* stop violated Feathers's Fourth Amendment rights, we must consider this an anonymous tip case, and we conclude that the search was unconstitutional under *J.L.* However, the determination of whether the officers violated Feathers's rights is only the first aspect of the qualified immunity inquiry. On the ultimate question of whether the officers acted reasonably under the circumstances and are entitled to qualified immunity from civil liability, we must agree with the officers that this is a dispatcher case: Knowing only what the dispatcher told them, the officers cannot be held civilly liable for the search.

First, we determine whether the officers violated Feathers's constitutional rights. The question is whether, at the moment that they initiated the stop, the totality of the circumstances provided the officers with the reasonable suspicion required in order to detain a citizen under *Terry*. *See, e.g.*, *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (instructing courts to look at totality of circumstances in determining existence of reasonable suspicion). Based on the dispatcher's description over the police radio of a suspicious person, the officers knew that on North Howard Street, a bearded, shirtless white male who possibly was intoxicated and possibly had a weapon had pointed something at a caller. Before the officers detained Feathers, they made only three other observations of Feathers. He was with a woman, he was talking while he paced on the porch, and he had his hands in his pockets.

The officers did not know that the dispatcher's information was from an anonymous tipster who offered no evidence of

reliability, but for purposes of determining whether the *Terry* stop was reasonable, we must impute to the individual officers the dispatcher's knowledge that the tip was anonymous. In *United States v. Hensley*, 469 U.S. 221, 232 (1985), the Supreme Court ruled that a *Terry* stop based on reasonable suspicion that came from a police bulletin or flyer from other officials is permissible to whatever extent the bulletin itself was based on articulable facts that would support reasonable suspicion. That is, "if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop." *Id.* On the other hand, "[i]f the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment." *Id.* Thus, if the dispatcher had sufficient information to find reasonable suspicion for a *Terry* stop, the stop was permissible. But if the dispatcher lacked sufficient information to satisfy the reasonable suspicion requirement, and the officers' subsequent observations did not produce reasonable suspicion, then the stop violated Feathers's Fourth Amendment rights. *See also United States v. Hinojos*, 107 F.3d 765, 767 (10th Cir. 1997) ("[A] *Terry* investigation in reliance upon a police bulletin is justified only if the bulletin itself is based on reasonable suspicion or is augmented by independent police corroboration.") (citations omitted).

Based on all of the information available to law enforcement officials at the time, we conclude that the officials did not have sufficient information to support a finding of reasonable suspicion. The individual who called 911 and led the police to North Howard Street refused to leave his name, and the Supreme Court has expressly held that when an anonymous tip is neither supported with indicia of reliability nor corroborated with police observation, it cannot provide an officer reasonable suspicion for a *Terry* stop. *See J.L.*, 529 U.S. at 271. In *Florida v. J.L.*, the Supreme Court ruled that police lacked reasonable suspicion to search an individual when their suspicion was based solely on an anonymous tip that an individual matching the

defendant's description and location was carrying a gun. *See id.* at 268. Unlike known or identified informants, anonymous tipsters, without more, cannot be deemed reliable regarding their allegations. *See id.* at 270. Further, as the Court discussed in *Alabama v. White*, 496 U.S. 325, 332 (1990), unlike tips that predict future movements or indicate some inside knowledge of the criminal activity, mere descriptions of outwardly observable facts provide no indication of a "special familiarity" with the criminal behavior that suggests reliability.

Here, the caller did not provide the dispatcher sufficient information to support a reasonable suspicion. The caller's suggestion, after refusing to leave his name, that the police could "have somebody come by here," J.A. at 70, hardly provides the reliability that comes from an identified or repeat informant. *See Gates*, 462 U.S. at 228-29, 233-34 (suggesting that tip might be made more reliable if it came from an informant "known for the unusual reliability of his predictions" or from "an unquestionably honest citizen," neither of which was present here). Similarly, the informant offered no future predictions or inside information that would suggest a special knowledge of Feathers's allegedly criminal activity. Indeed, the anonymous tipster did not even allege *any* criminal activity; it was the dispatcher, not the tipster, who suggested that Feathers might be carrying a weapon. The caller said only that Feathers pointed "something" at him, but that the caller "d[id]n't know what he pointed," J.A. at 70, a comment that the dispatcher reported as "supposed to be carrying a weapon," J.A. at 71. Accordingly, if the basis for the *Terry* stop is the information in the dispatch alone, then the detention lacked reasonable suspicion.

The officers allege that the "totality of the circumstances" justified their search. Indeed, if their observations, when combined with the information provided to the dispatcher, supported a finding of reasonable suspicion, the detention would be permissible. The officers suggest that by corroborating the information from the tip, and finding a shirtless white male on North Howard Street, they were able