NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0700n.06

Nos. 09-3485, 09-3486

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

**Nov 12, 2010**

LEONARD GREEN, Clerk

| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | C O U R T   F O R   T H E |
| | ) | NORTHERN DISTRICT OF |
| ROY HAIRSTON, | ) | OHIO |
| | ) | |
| Defendant-Appellant. | ) | O P I N I O N |
| | ) | |

BEFORE:    DAUGHTREY, GILMAN, McKEAGUE, Circuit Judges.

**McKeague, Circuit Judge.**  Roy Hairston pled guilty to one count of possession of a handgun by a felon, in violation of 18 U.S.C. § 922(g)(1), and was sentenced to fifty months' imprisonment.  Prior to his plea, Hairston filed a motion to suppress the handgun that was seized from his car by officers, arguing that the tip on which the officers relied to stop his vehicle was uncorroborated and anonymous, and did not create the requisite reasonable suspicion to initiate a stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968).  The district court denied the motion, concluding that the tip was not anonymous and reasonable suspicion existed to justify the stop.  Hairston now appeals the denial of his motion and also challenges the substantive and procedural reasonableness of his sentence.  Because the officers had reasonable suspicion to stop Hairston's car, and because Hairston waived his right to appeal his sentence, we AFFIRM Hairston's conviction and sentence.

## I. BACKGROUND

On October 8, 2008, at approximately 2:55 a.m., the Cleveland Police Department Dispatch Center received a call from a woman named Alice. As agreed to by Hairston and summarized at his plea hearing, Alice reported that

> a black male dressed in a suit and driving a silver Charger had just offered marijuana to her male friend in exchange for sex with her. She further advised the dispatch officer that she had seen the man with a silver handgun and that she felt threatened by that firearm. She provided the dispatch officers with her phone number and her full address, including her apartment number. She also was able during the course of the phone conversation to provide the officers with real time movements, indicators of his movements, and also when he had pulled up next to her home.

Patrol Officer Kevin Stanard and his partner received a radio assignment from the dispatcher who took Alice's call, asking them to respond to the address provided by Alice. Stanard testified at Hairston's suppression hearing that the address was in a "high crime area, [with] a lot of drug activity, [and a] lot of prostitution activity . . . ." The dispatcher told Stanard and his partner that they were looking for a well-dressed black male driving a silver Dodge Charger who had threatened a female with a gun at the address given. The dispatcher also told them that the vehicle was still on the victim's street in front of her home. The assignment was given a "Code 1," which is the "highest priority" that can be given when a call is radioed out and typically means that a serious crime is currently occurring.

Officer Stanard responded to the area at approximately 3:00 a.m. and noticed a silver Dodge Charger, the only car in the area, at a stop sign directly in front of the address given by the dispatcher. As Officer Stanard's car approached, the Charger "sped away" and made a left turn at a "very high speed," in excess of the speed limit. Officer Stanard and his partner followed the

vehicle, which fit the description given by the dispatcher. Officer Stanard testified that he never lost sight of the Charger, the only vehicle on the road at the time, and he followed it as the driver proceeded down the street, made a right turn at a stop sign, and then made a left turn at another stop sign, all while proceeding at a high rate of speed.

After following the vehicle for a few blocks, Officer Stanard activated his lights and siren and pulled the vehicle over, although he had not identified the driver or confirmed the driver's attire prior to initiating the stop. Officer Stanard and his partner exited their car and, suspecting that the driver was armed based on the information provided by the dispatcher, approached "cautiously" while yelling for the driver to put his hands outside of the window in plain sight. The driver, later determined to be Hairston, eventually complied after numerous requests. Officer Stanard and his partner approached the car, removed Hairston from the vehicle, placed him on the ground, and put him in handcuffs. The officers conducted a pat down of Hairston and placed him in the back of their patrol car, advising him that he was not under arrest but that his vehicle matched the description of the one they had been looking for based on the dispatcher's alert. Officer Stanard and his partner searched the Charger, observing "five or six clumps" of marijuana sitting in the console in the front seat. The officers also found a chrome gun under the driver's side seat containing three rounds of live ammunition and one round in the chamber.

After other officers arrived on the scene, Officer Stanard and his partner left to locate the victims. When they arrived at the address originally given to them by the dispatcher, the victims were standing at the corner and flagged down the officers. Officer Stanard and his partner interviewed the victims, who explained that Hairston had driven by and almost ran into them with

his car; that somehow they began speaking to Hairston and approached his car; and that Hairston was "trying to broker some kind of deal" to give the male victim marijuana in exchange for sex with Alice. At some point the male victim ended up with the marijuana in his possession but returned it to Hairston, informed him that they did not want to do what he was asking, and returned to Alice's apartment. Both victims also confirmed the 911 report that Hairston had a gun in his hand and was "waving it around and basically threatening them with it."

Hairston filed a motion to suppress the handgun, arguing that because the caller was anonymous and the tip was uncorroborated, the officers lacked the requisite reasonable suspicion to stop his car. At the suppression hearing, the court determined that the 911 caller was not anonymous because she had provided her name, phone number, address, and apartment number to the dispatcher. On the basis of the information provided by Alice, as well as the circumstances preceding the stop, the court found that the officers had reasonable suspicion to stop Hairston's vehicle, and accordingly denied Hairston's motion to suppress the gun.

After his motion was denied, Hairston pled guilty to being a felon in possession of a firearm, waiving his right to file any appeal except one challenging the denial of his motion to suppress and any sentence in excess of the statutory maximum or Sentencing Guidelines range. At his sentencing hearing, the district court determined that, consistent with his presentence report ("PSR"), Hairston's Guidelines range of imprisonment was 46–57 months. Considering all the relevant factors, the court concluded that Hairston was not entitled to a variance or departure, and sentenced him to fifty months in prison. Hairston filed this timely appeal.

## II. ANALYSIS

### A. Motion to Suppress

Hairston first challenges the district court's denial of his motion to suppress the handgun retrieved from his car after he was stopped by Officer Stanard, arguing that there was no reasonable suspicion to justify the stop. "In reviewing a motion to suppress, we review the district court's factual findings for clear error and legal determinations *de novo.*" *United States v. Long*, 464 F.3d 569, 572 (6th Cir. 2006). Where the district court has denied the motion, this court "must consider the evidence in the light most favorable to the government." *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998). Factual determinations made by the district court will be overturned only if this court has "the definite and firm conviction that a mistake has been committed." *Long*, 464 F.3d at 572 (internal quotation marks omitted).

The Fourth Amendment protects an individual's right to be free from "unreasonable searches and seizures," and typically requires that a search or seizure be supported by probable cause. U.S. Const. amend. IV. However, in *Terry*, the Supreme Court held that an officer may conduct an investigatory stop without probable cause, where the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous . . . ." 392 U.S. at 30. "However, to justify a *Terry* stop, an 'inchoate and unparticularized suspicion or hunch' is not sufficient." *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010) (quoting *Terry*, 392 U.S. at 27). The officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. When

making such inferences, officers may draw on their own experience in law enforcement and specialized training. *See Smith*, 594 F.3d at 537; *United States v. Flores*, 571 F.3d 541, 544 (6th Cir. 2009). While an individual's presence in a high-crime area is insufficient to support a finding of reasonable suspicion standing alone, "a location's characteristics are relevant 'in determining whether the circumstances are sufficiently suspicious to warrant further investigation.'" *Flores*, 571 F.3d at 544 (quoting *Illinois v. Wardlow,* 528 U.S. 119, 124 (2000)).

"In assessing the reasonableness of the stop, the facts are 'judged against an objective standard: would the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief' that the action taken was appropriate?'" *United States v. Hardnett*, 804 F.2d 353, 356 (6th Cir. 1986) (quoting *Terry*, 392 U.S. at 21–22). When undertaking a review of an investigatory stop, we must look to the totality of the circumstances to determine if reasonable suspicion existed to justify the stop at its inception. *United States v. Lane*, 909 F.2d 895, 897 (6th Cir. 1990).

Relying heavily on *Florida v. J.L.*, 529 U.S. 266, 270 (2000) and *Feathers v. Aey*, 319 F.3d 843, 850 (6th Cir. 2003), Hairston argues that the tip relied on by Officer Stanard to stop his vehicle was anonymous until after the stop and search occurred, and was uncorroborated. According to Hairston, the district court used "select circumstances" rather than examining the totality of the circumstances, improperly imputing to the officer the information that had been given to the radio dispatcher. Hairston asserts that there was no reasonable suspicion, making the *Terry* stop unlawful and requiring suppression of the handgun.

The cases on which Hairston relies to support his claim actually support our conclusion that reasonable suspicion existed to justify the stop. First, this circuit has expressly stated that "[a]n informant's tip is sufficient to establish reasonable suspicion; it need not be based exclusively on an officer's personal observations." *Hardnett*, 804 F.2d at 356. More importantly, and contrary to Hairston's argument, even if Officer Stanard did not know all of the informatin given to the dispatcher, this court explained in *Feathers* that it "must impute to the individual officers the dispatcher's knowledge" about a tip for the purpose of determining whether the *Terry* stop was reasonable. 319 F.3d at 849. Accordingly, on the informant's call alone, "if the dispatcher had sufficient information to find reasonable suspicion for a *Terry* stop, the stop was permissible." *Id.* Likewise, "if the dispatcher lacked sufficient information to satisfy the reasonable suspicion requirement, and the officers' subsequent observations did not produce reasonable suspicion, then the stop violated [Hairston's] Fourth Amendment rights." *Id.*

Here, the informant Alice provided the radio dispatcher with her name, address, apartment number, and phone number, all of which must be imputed to Officer Stanard prior to the stop. This information also was later verified when Officer Stanard and his partner went to the given address and spoke with the victims about the incident. Thus, unlike *J.L.*, where the caller refused to provide a name and the caller's location was unknown, it cannot be said that Alice was "anonymous." *See J.L.*, 529 U.S. at 270. Her "reputation [could] be assessed" and she could "be held responsible if her allegations turn[ed] out to be fabricated." *Id.* Furthermore, the information Alice provided on the audio recording to the dispatcher, unlike the information provided by the informants in both *J.L.* and

*Feathers*, gave an account of criminal activity that had taken place in her presence, provided significant identifying information, and conveyed real time updates regarding Hairston's movements and present location. *See J.L.*, 529 U.S. at 272 (explaining that an accurate description of location and appearance is reliable in the "limited sense" of identifying the individual accused of criminal activity, but to amount to reasonable suspicion, there also must be reliability in a tip's assertion of illegality); *Feathers*, 319 F.3d at 850 (holding that reasonable suspicion does not exist when the information provided consists of "easily obtained facts and conditions existing at the time of the tip" that only describe an individual in a relevant area).

Moreover, the tip was not uncorroborated. Alice told the dispatcher that Hairston was driving a silver Charger and that it was located in front of her residence, for which she provided the exact address. When Officer Stanard arrived on the scene he saw just what Alice had described: a silver Charger was located in front of the address given to Stanard as the address of the victim's apartment. When Officer Stanard approached in his police vehicle, the Charger sped away from the scene at a high rate of speed until pulled over by Officer Stanard. *See United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir. 2006) ("Given that simply walking away from the police does not give rise to reasonable suspicion, we agree that the speed of the suspect's movements may be relevant in the totality of the circumstances." (internal quotation marks and citations omitted)).

Finally, the "contextual considerations" support a finding of reasonable suspicion. Officer Stanard testified that he received the call from dispatch at almost 3:00 a.m. and that the address was in a high crime area. *See Wardlow*, 528 U.S. at 124 (explaining that "officers are not required to

ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation"). This court previously has determined that "an individual, whose general appearance and location matched the description given in the anonymous shot-fired call, [who] fled and made furtive movements when approached by the police late at night in a high-crime area–provided reasonable suspicion to conduct a *Terry* stop." *Caruthers*, 458 F.3d at 468. Here, not only are the relevant facts nearly identical, but the caller was actually identified rather than anonymous. Thus, it was not error for the district court to find that reasonable suspicion existed to stop Hairston's car and thus deny Hairston's motion to suppress.

**B. Reasonableness of Sentence**

Hairston also argues that his sentence was procedurally and substantively unreasonable due to the district court's failure to consider his request for a lower sentence and the "excess amount of weight" given to his prior criminal history. However, as Hairston readily concedes, he executed a plea agreement containing an appellate waiver. The plea agreement stated that Hairston expressly waived all rights to appeal his sentence, except a sentence that was "in excess of the statutory maximum" and or one that exceeded "the maximum of the sentencing range determined under the advisory Sentencing Guidelines, except as exceeded by the statutory mandatory minimum, in accordance with the sentencing stipulations and computations in [the plea] agreement, using the criminal History Category found applicable by the [c]ourt."

It is well-settled in this circuit that "[a]ny right, even a constitutional right, may be surrendered in a plea agreement if that waiver was made knowingly and voluntarily." *United States*

*v. Ashe*, 47 F.3d 770, 775–76 (6th Cir. 1995); *see also United States v. Fleming*, 239 F.3d 761, 763–64 (6th Cir. 2001) ("The sine qua non of a valid waiver is that the defendant enter into the agreement knowingly and voluntarily."). Under Rule 11 of the Federal Rules of Criminal Procedure, the district court "must inform the defendant of, and determine that the defendant understands . . . the terms of any plea-agreement provision waiving the right to appeal . . . ." Fed. R. Crim. P. 11(b)(1)(N). Rule 11, however, "does not require a district court specifically to ask a defendant whether he understands the terms of a waiver provision; rather, it only requires a court to 'determine' that the defendant understands the terms of such provision." *United States v. Zumot*, 337 F. App'x 520, 523 (6th Cir. 2009). "We review de novo the question of whether a defendant waived his right to appeal his sentence in a valid plea agreement." *United States v. Almany*, 598 F.3d 238, 240 (6th Cir. 2010).

Hairston does not argue, nor does the record suggest, that his waiver of appellate rights was anything less than knowing and voluntary. In fact, at the plea hearing the district court confirmed with Hairston and his counsel that Hairston understood the appellate-waiver provision. The court went through the waiver provision and fully explained the limited contexts in which Hairston could file an appeal. Hairston repeatedly stated that he understood he was giving up all of his rights to appeal except in those specifically designated circumstances. The plea agreement itself also contained a provision acknowledging that Hairston "freely and voluntarily" entered into the agreement and that he had discussed the case with his attorney and had been advised of his rights prior to accepting the plea.

Hairston also does not argue that any of the exceptions to the waiver apply. Had he raised such an argument, it would be without merit. As noted, Hairston waived all rights to appeal any sentence, except one that exceeded the statutory maximum or exceeded the sentencing range established by the U.S. Sentencing Guidelines Manual ("U.S.S.G."). Hairston was convicted of possession of a handgun by a felon, pursuant to 18 U.S.C. § 922(g)(1), which is punishable under 18 U.S.C. § 924(a)(2) by a maximum sentence of ten years. Additionally, as the parties stipulated in the plea agreement, Hairston's base offense level was twenty-four under U.S.S.G. § 2K2.1(a)(2). Hairston received a three-level reduction for acceptance of responsibility, making his total offense level twenty-one. With his prior criminal history, Hairston's criminal history category was III, resulting in a Guidelines range of imprisonment of forty-six to fifty-seven months. *See* U.S.S.G. ch. 5, pt. A, sentencing table. The district court imposed a mid-range sentence of fifty months in prison, which does not exceed the statutory maximum or the established Guidelines range. Thus, because Hairston's appellate waiver was knowing and voluntary and none of the exceptions to his waiver apply, his challenge to the reasonableness of his sentence is not properly before this court.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM Hairston's conviction and sentence.