**NOT RECOMMENDED FOR PUBLICATION**
File Name: 17a0366n.06

**No. 16-5599**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Jun 26, 2017<br>DEBORAH S. HUNT, Clerk |
|  | ) |  |
| Plaintiff-Appellee, | ) |  |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
| GERALD DEWAYNE JACKSON, | ) | COURT FOR THE EASTERN |
|  | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellant. | ) |  |
|  | ) |  |
|  | ) |  |

BEFORE:    BOGGS, SILER, and DONALD, Circuit Judges.

BOGGS, Circuit Judge.  Can the appearance of an unfamiliar car in the middle of night at the scene of a home invasion during the crime provide reasonable suspicion to stop that car weeks later?  Because it was a reasonable inference that the criminals had fled in a vehicle and there were indications that this particular vehicle may have had evidence of the crime, we answer yes: the police officer's stop of Jackson was constitutional and we affirm the district court.

I

On the night of July 17–18, 2013, three armed black men approached an unsuspecting man exiting his vehicle and attempting to enter his duplex home on Birchwood Drive in Chattanooga, Tennessee.  Menacing the resident with their guns, the trio pressed him inside the residence, pistol-whipped him, and took his keys.  Once indoors, the three attackers tied the man up with duct tape.  The robbers searched the house, seeking drugs and money—which they were

unable to find—for some three hours. Instead, they took the victim's flat-screen TVs, PlayStation, long rifle, and 9-mm pistol. Hoping for better luck next door, the three robbers used their captive as a human shield and forced their way into the other home of the duplex. All three fled when an alarm sounded, leaving their victim with a broken arm and head lacerations. The entire incident took place in the hours just after midnight, and the police arrived sometime after 4 a.m.

Officer Michael Early returned to the scene the next day to speak with neighbors in an attempt to gather leads. He testified that he met with several neighbors, one of whom wished to remain anonymous for fear of retaliation but mentioned that she and her friend had returned home after midnight and noticed a beat-up silver or gray four-door vehicle parked on the street just on the edge of the robbed duplex's property line. Of particular importance to this case, she observed that it was missing "the whole front bumper." The neighbor recalled that neither she nor her friend had ever seen the car on the street before. Early looked for the vehicle around Chattanooga in his patrols, but was unsuccessful for over two and a half weeks. In his report on the incident written about one week after the home invasion, he omitted the description of the vehicle so that he would not have to report information regarding the anonymous witness. Although Early did not learn the name of the neighbor, he did know her home address.

While Early continued to search for the car with the missing bumper, the Kennedy Jewelers store in Chattanooga was attacked on August 5, 2013. Two men entered the store, one of them carrying a rifle. They also brought with them a blue laundry basket, presumably to aid in their plan to steal the business's valuable merchandise. The scheme went awry when they were confronted by an armed employee, and the three exchanged gunshots. The would-be robbers fled without stealing any goods and left their blue hamper behind. One man ran on foot

while the other, described as a "very tall, thin build black male with . . . shoulder length dreads," made his escape in a car. The car, recorded on surveillance video, was a four-door silver sedan with wheels that appeared either to lack hubcaps or to have blacked-out rims. The suspect who fled on foot, described as another black male, was later discovered some distance away at a nearby home when witnesses pointed him out to police. An assault rifle was also recovered one street over from the jewelry store after a resident reported to the police that a "silverish or gray car stall[ed] out and then [a man] thr[e]w a gun from the passenger side of the car."

On August 6, Early was briefed on the Kennedy Jewelers robbery attempt. He watched the video of the silver car driving outside of the store and observed that the wheels were blacked out. Then he left the office in an unmarked car. Two minutes later, he passed a silver car missing its front bumper going the other direction on Amnicola Highway. He turned around and caught up to it, confirming that the whole front bumper was missing and noting that the occupants were three black men. When he turned on his flashing blue lights and siren, the silver car did not stop but continued on its way without increasing its speed. Early radioed for another car, and a short time later a marked police car blocked the silver car's path and stopped it. When Early approached the car, he noticed that the car was missing its hubcaps, like the car in the video he had watched minutes earlier. He also observed that one of the car's occupants was "a black male with long dreads and extremely tall[—]at least 6'4"." This was the appellant, Gerald Jackson, who is tall, thin, and had dreadlocks. Connecting these facts to the previous day's attempted robbery, Early called the lead investigator on the case, Kendon Massengale. Early and the other responding officers commanded the occupants of the car to exit, patted them down for weapons, and handcuffed them. Early peered into the car through its windows and saw a towel, some clothes, and white tennis shoes. He learned that the car was registered to someone named

Dozier, and Jackson advised that it was his grandmother's vehicle. Early left and, after twenty minutes, the contents of the car were inventoried and the vehicle was towed to Early's office. The three occupants were also brought in to the office. At some point, an officer took a cell phone from Jackson's pocket and brought it to Massengale's desk. The other two occupants of the car were released, but Jackson was held for an additional period.

Early and Massengale went to Betty Dozier's home, which she shared with Jackson. She gave them permission to search the house, and in the garage they found a magazine to a Saiga .223-caliber rifle, the same style of weapon recovered near the jewelry store. Dozier also informed officers she was missing her laundry basket and Pantech phone (which matched the description of Jackson's cell phone). She then granted officers her written consent to search her car and phone. Returning to the office, Massengale searched the phone and found photos of both Dozier and Jackson. Several photos showed Jackson holding an assault rifle that matched the recovered rifle. The police also completed a full search of the vehicle. That night, Jackson was formally arrested for the robbery.

In February 2014, Jackson and the other robbery suspect, Diontre Danforth, were indicted by a federal grand jury for Hobbs Act robbery and the use, carrying, brandishing, and discharge of a firearm during a crime of violence, and Jackson was charged with possession of a firearm after a felony conviction. Jackson filed a motion to suppress, seeking to exclude the "appearance of the car itself, [Jackson's] presence in the car, the tennis shoes found in the car, any of the Defendant's statements, the cell phone . . . located on [Jackson's] person and all of its contents, the statements made by Ms. Dozier and the magazine located in [Dozier's] garage." The magistrate judge recommended denial of the motion, and the district court agreed and adopted his report and recommendation.

Jackson entered into a conditional plea agreement, pleading guilty to an attempted Hobbs Act robbery and to using, carrying, and discharging a firearm during and in relation to a crime of violence for the attempted robbery of Kennedy Jewelers on the understanding that he could appeal the denied motion to suppress. He was sentenced to 175 months of imprisonment and timely brought this appeal seeking review of whether the information provided by the anonymous neighbor was reliable and whether there was reasonable suspicion to stop Jackson's car.

## II

### A. Standard of Review

We review a district court's suppression motion under a mixed standard of review, assessing the district court's findings of fact for clear error and its legal conclusions de novo. *United States v. Akridge*, 346 F.3d 618, 622 (6th Cir. 2003). Furthermore, we review a denial of a motion to suppress with the evidence viewed in the light most favorable to the government. *Id.* at 622–23.

### B. Reasonability of Early's Suspicion

Jackson's challenge to the district court's motion to dismiss is premised upon the invalidity of Early's stop. He challenges the stop in two ways: first, that the information that undergirded Early's suspicion was unreliable, and second, that even with that information, Early's suspicion was unreasonable. We address each argument in turn.

*1. Reliability of the neighbor's information.* Jackson questions the value of the information that Early received from the neighbor, who never provided her name. He argues that because Early had no idea whether she had a reputation for truthfulness or whether she actually

was a neighbor, the information "must be deemed unreliable without further corroboration." Appellant's Br. 12.

It is true that the Supreme Court has viewed anonymous tips with suspicion. In a number of cases, notably *Florida v. J.L.*, 529 U.S. 266 (2000) and *Alabama v. White*, 496 U.S. 325 (1990), the Court has expressed its concern about "anonymous tip[s] lacking indicia of reliability." *J.L.*, 529 U.S. at 274. But in the recent case of *Navarette v. California*, 134 S. Ct. 1683 (2014), a majority of the Court held that an anonymous 911 caller's tip was sufficiently reliable to provide reasonable suspicion to stop another driver. *Id.* at 1692.

In *J.L.*, the police received a call "made from an unknown location by an unknown caller," who stated that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." 529 U.S. at 268, 270. In finding that the tip "lacked . . . moderate indicia of reliability," the Court observed that all that officers had to rely on was a "bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information." *Id.* at 271. The *Navarette* majority contrasted that situation with one where an anonymous eyewitness to alleged dangerous driving called 911 to report the crime. There, the Court noted that one of the "indicator[s] of veracity" was the use of the 911 emergency system because "[a] 911 call has some features that allow for identifying and tracing callers." *Navarette*, 134 S. Ct. at 1689. This, coupled with the fact that the report came shortly after the alleged crime and provided the basis for the informant's knowledge, was sufficient under the totality of the circumstances to find the tip reliable. *Id.* at 1688–90.

This court in *United States v. Long*, 464 F.3d 569 (6th Cir. 2006), evaluated a case bearing some similarity to this one. In *Long*, an anonymous citizen called 911 to report a

burglary at a neighbor's house. *Id.* at 570–71. The neighbor described to police the trucks that were at the house, the races of the burglars, and their direction of travel, and police headed to the location to search for the trucks. *Id.* at 571. Finding a truck fitting the description provided by the anonymous caller, a police officer stopped the vehicle. *Ibid.* We held that the anonymous caller provided sufficient reliability to support reasonable suspicion that the truck was involved in the burglary. *Id.* at 573. Despite the fact that the caller was unnamed, the police were aware of his address and "the informant's identity was easily ascertainable . . . by the police." *Id.* at 574. "Whether or not the authorities were aware of the caller's name in this situation added little to the reliability determination . . . ." *Id.* at 573–74.

Correspondingly, although Early did not take down her name, the neighbor's identity was "easily ascertainable" because police were aware of where she lived and what she looked like. Though Jackson notes that the police "[s]imply know[] what the informant looks like and where she was physically located on a particular date and time," officers do not need absolute certainty for an indicator of reliability. By Jackson's logic, the use of the 911-emergency system in *Navarette* could not have been indicative of reliability because all the police had was a phone number, and the caller could change numbers. What is important is that the police knew where to look for the informant and that the informant was aware of this fact. *See Navarette*, 134 S. Ct. at 1689–90 (observing that "a false tipster would think twice before using [the 911] system" because it can record information about a caller, *id.* at 1690); *J.L.*, 529 U.S. at 270 (contrasting an anonymous tip from one where an informant "can be held responsible if her allegations turn out to be fabricated"); *Long*, 464 F.3d at 573 (finding useful in analysis that "[i]f the caller turned out to have been lying, the police could have confronted him immediately"). Given these

facts, the neighbor's information had sufficient indicia of reliability to be used by Early in his investigation of the home invasion.

2. *Whether Early had sufficient suspicion to stop Jackson's car.* Jackson argues that even if the information could be considered reliable, that knowledge was insufficient to provide reasonable suspicion. Of course, "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *United States v. Hensley*, 469 U.S. 221, 229 (1985). We examine the circumstances at the time that Early initiated the stop; therefore, Early's later observation of the missing hubcaps is irrelevant.

Determining reasonable suspicion requires an examination of the totality of the circumstances. *See United States v. Garrido*, 467 F.3d 971, 981 (6th Cir. 2006). Early knew that a silver or gray four-door sedan missing its front bumper had been observed late at night during the time of the July 18 home invasion and had never been seen in the neighborhood before. Jackson has conceded the particularity of the car's description, which means that we may assume that Jackson's car fit the description of the car spotted outside of the scene of the crime.

Jackson stresses the length of time (nineteen days) that elapsed between the home invasion and Early's stop of the vehicle. Many of our cases examining reasonable suspicion to stop vehicles reportedly involved in a crime make note of the fact that the stops take place shortly after the alleged crime. *See United States v. Hairston*, 402 F. App'x 84, 88 (6th Cir. 2010) (observing car was still at location of alleged crime shortly after call); *United States v. Molina*, 226 F. App'x 523, 528 (6th Cir. 2007) (same); *Long*, 464 F.3d at 575 (describing as one of the supporting facts for reasonable suspicion "the arrival of the truck in the predicted time frame traveling in the predicted direction"); *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir.

2000) (noting the vehicle was observed "at a location consistent with the time needed to travel to that point from the [burglary location] (i.e., less than a half-hour after the burglary was reported)"). But delay is relevant here only insofar as it reduces the chances that the presently observed vehicle is the same as the one observed at the scene of the crime. As particularity of the description increases, the effects of delay decrease. For example, were Early to have the car's license-plate number and then observe a car nineteen days later with the plate in question, the delay would have little effect on the suspicion that the car was the same. In contrast, were the description merely of a silver car, a stop of a silver car down the street from the site of the home invasion mere minutes later would certainly be more reasonable than one nearly three weeks later. In this case, where the particularity of the car's description has been conceded, it is sufficient to overcome the confounding effects of the nineteen-day delay. *Cf. United States v. Marxen*, 410 F.3d 326, 330 n.4 (6th Cir. 2005) ("[W]here, as here, police are not able to locate the suspect vehicle immediately after the robbery and during a time within which contraband and other fruits of the crime are more likely to be found[,] . . . the difference in a traffic stop occurring eleven days—as opposed to one or two days—following the criminal activity is not dispositive.").

The most difficult and dispositive question is whether the appearance of the bumperless car outside of the duplex during the robbery is sufficient to provide reasonable suspicion to stop it. Jackson asserts that there was no demonstrable nexus between the car and the home invasion. The neighbor's description did not include any indication beyond proximity (both temporal and physical) that the car was involved in the crime. But proximity can be a relevant factor in forming reasonable suspicion. *See Houston v. Clark Cty. Sheriff Deputy John Does 1–5*, 174 F.3d 809, 813 (6th Cir. 1999) (finding link between a crime and a vehicle where an officer

observed a man jump into a car and take off from the scene of the crime (a crowded and rowdy bar)). The neighbor had observed an unfamiliar car in the middle of the night located during a robbery just outside the home that was robbed. Given that the robbers fled with, among other things, televisions and a gaming system, it was reasonable to believe that they departed by vehicle. *Cf. Orricer v. Erickson*, 471 F.2d 1204, 1207 (8th Cir. 1973). There was therefore reasonable suspicion that the occupants of the car had been involved in the robbery. Moreover, this court has held that "the police are permitted to make *Terry* stops to investigate completed crimes when the police have reasonable suspicion to believe only that the stop will produce evidence of a crime." *Marxen*, 410 F.3d at 331. Thus, if there was reasonable suspicion to believe that the car itself was involved, there is no need to have reasonable suspicion even that the occupants themselves had been involved in the robbery.[1]

*United States v. Hurst* most closely parallels this case on this issue. In that case, a resident reported having seen a dark-colored car that he thought was a Thunderbird in his driveway just before he learned that his house had been burglarized. 228 F.3d at 755. That information was sufficient to stop a dark Mercury Cougar at a distance consistent with the time needed to travel to that point from the burglary some twenty-five minutes away. *Id.* at 757. While in *Hurst* the suspected vehicle was admittedly in the driveway of the home that had been the scene of the crime, that fact of proximity around the time of the burglary was the only thing linking the car and its occupants to the burglary. Thus, the location of the out-of-place car in this case "right . . . at the edge of the property line" is a key factor in analyzing reasonable suspicion.

The cases of *United States v. Patterson*, 340 F.3d 368 (6th Cir. 2003), and *United States v. Cohen*, 481 F.3d 896 (6th Cir. 2007), are not to the contrary. In both of those cases, we held

---

[1] The government makes much of the fact that Early saw three black males in the vehicle as well, which matched the description of the home invaders. Given the nineteen-day delay between the robbery and the observation of the vehicle, this fact is of some, but limited, additional value.

that there was no reasonable suspicion for police stops on the basis of anonymous tips that criminal activity was afoot. *Cohen*, 481 F.3d at 901; *Patterson*, 340 F.3d at 372. But there, precisely because the tips were anonymous, there was no objective proof of a crime at all: in *Patterson*, the tip came from a call to a drug hotline; in *Cohen*, it was a 911 hang-up—but neither had any reliable corroborating evidence to support the suspicion.[2] *Cohen*, 481 F.3d at 899–900; *Patterson*, 340 F.3d at 370–72. Instead, merely after seeing persons leaving the area that the anonymous tipster had indicated, the police initiated their stops. Here, however, evidence of the actual crime of a home invasion was strong. Thus, the reasonableness of suspicion placed on persons at the scene of the crime is increased—though not necessarily alone sufficient. When combined with other factors—the time of night, the fact that the vehicle was not known in the neighborhood and was gone by the next day, and that a vehicle was likely used in the robbery— however, these circumstances provide reasonable suspicion that Jackson's car was involved in the July 18 robbery. As a result, Early was within constitutional bounds when stopping the vehicle on August 6.

III

Because the information provided by the neighbor of the home-invasion victim regarding the bumperless car at the scene of the crime had sufficient indicia of reliability and Early therefore had reasonable suspicion that Jackson's vehicle was involved in the July 18 robbery, we **AFFIRM** the district court's denial of Jackson's suppression motion.

---

[2] The same is true of the unpublished case of *Srisavath v. City of Brentwood*, 243 F. App'x 909 (6th Cir. 2007), where an anonymous caller informed police of youths looking into parked cars.